# BRASS *v.* NORTH DAKOTA, *ex rel.* STOESER.

ERROR TO THE SECOND JUDICIAL DISTRICT COURT OF RAMSEY
COUNTY, STATE OF NORTH DAKOTA.

No. 768. Argued April 26, 1894. — Decided May 14, 1894.

The act of March 7, 1891, c. 126, of North Dakota, " regulating grain ware-
houses and weighing and handling of grain," declaring elevators, etc., to
be public warehouses, and their owners to be public warehousemen, and
requiring them to give bond conditioned for the faithful performance
of their duty as such, fixing rates of storage, and requiring them to keep
insured for the benefit of the owners all grain stored with them, does not
apply to elevators built by a person only for the purpose of storing his
own grain, and not to receive and store the grain of others, and being so
construed it does not deny the equal protection of the laws to the owner
of an elevator made a public warehouse by it, does not deprive him of his
property without due process of law, does not amount to a regulation of
commerce between the States, and is not in conflict with the Constitu-
tion of the United States.
This case differs in no substantial respect from *Munn* v. *Illinois*, 94 U. S.
113, and *Budd* v. *New York*, 143 U. S. 517, and an adherence to the rul-
ings in those cases requires the affirmance of the judgment of the court
below.

THIS case was submitted on the 15th day of December, 1892.
On the 16th of October, 1893, the court ordered it to be
restored to the docket, for argument before a full bench, and
argument was had accordingly April 26, 1894. The case then
made is stated by the court as follows:

Norman Brass, the plaintiff in error, owns and operates a
grain elevator in the village of Grand Harbor, in the State of
North Dakota. The defendant in error, Louis W. Stoeser,
owns a farm adjoining the village, on which in the year 1891
he raised about four thousand bushels of wheat. On Septem-
ber 30, 1891, Stoeser applied to store a part of his wheat-crop
for the compensation fixed by section eleven of chapter 126 of
the Laws of North Dakota for the year 1891, which Brass
refused to do unless paid therefor at a rate in excess of that
fixed by the statute. On this refusal Stoeser filed in the

District Court of Ramsey County, North Dakota, a petition for an alternative writ of mandamus. The District Court granted an alternative writ of mandamus as follows:

"The State of North Dakota to Norman Brass, respondent: Whereas the following facts have been made to appear to this court by the verified petition of the above-named relator, to wit: 1. That he is the rélator in the above-entitled matter; that he owns and operates a farm containing 540 acres in the vicinity of the railroad station of Grand Harbor, in the county and State aforesaid, and during the year 1891 has raised on said farm about 4000 bushels of grain, principally wheat. 2. That the relator has not sufficient storage capacity on his farm or elsewhere for said grain so raised as aforesaid, but is dependent almost wholly upon the grain elevators and warehouses in the vicinity of said farm for storage capacity. 3. That fully fifty per cent of the grain raised in said Ramsey County, North Dakota, is dependent for storage capacity upon the grain elevators and warehouses at the various towns, villages, and railroad stations in said Ramsey County. 4. That the respondent, Norman Brass, is now and at all the time herein stated has owned and operated a grain elevator at the railroad station of Grand Harbor aforesaid for the purpose of buying, selling, storing, and shipping grain for profit. 5. That the relator on the 30th day of September, 1891, hauled fifty-eight bushels of wheat to the grain elevator of respondent, Norman Brass, at Grand Harbor aforesaid, and tendered the same at said elevator of said Norman Brass for storage, and requested said Norman Brass to receive, elevate, insure, and store said grain for twenty days, and at the time tendered to said Brass two cents per bushel for compensation for receiving, elevating, insuring, and storing said grain for twenty days; that said grain when so tendered as aforesaid was dry and in a suitable condition for storage, and there was in said grain elevator of said Brass at Grand Harbor aforesaid at said time storage capacity for over twenty-five thousand bushels of grain not in use and wholly unoccupied. 6. That said Brass then and there refused to receive said grain for the purpose aforesaid and wholly refused to store said grain at said price.

7. That the relator endeavored to secure storage for said grain at the only other elevator in operation at said railroad station of Grand Harbor aforesaid, but said elevator refused to receive relator's grain upon the same ground as respondent.  8. That the relator is informed and believes that the owners of grain elevators and warehouses within a radius of fifty miles of Grand Harbor aforesaid refuse to receive grain for storage at said price: Now, therefore, this court, in order that justice may be done in this behalf to him, Louis W. Stoeser, relator, does hereby command and enjoin you that immediately upon receipt of this writ you do receive from relator, while your storage capacity at your elevator herein mentioned is sufficient for that purpose, all grain that may be tendered you by the relator in a dry and suitable condition for storage at a rate of compensation not exceeding the following schedule, viz., for receiving, elevating, insuring, delivering, and twenty days' storage, two cents per bushel; storage rates after the first twenty days, one-half cent per bushel for each fifteen days or fraction thereof, and shall not exceed five cents for six months, or that you show cause to the contrary before this court at the court-house, in the city of Devil's Lake, Ramsey County, North Dakota, on the 5th day of October, 1891, at ten o'clock in the forenoon of said day, or as soon thereafter as counsel can be heard; and how you have executed this writ make known to this court at the time and place aforesaid, and have you then and there this writ.

"Dated Sept. 30th, 1891."

To which writ appellant made return by answer as follows:

"The return of the respondent to the alternate writ of mandamus issued in the above-entitled proceeding shows to the court—

"1. That the respondent admits the truth of the facts pleaded in said alternative writ.

"2. For a further return to the said alternative writ the respondent alleges that he owns and operates only one grain elevator in North Dakota or elsewhere; that the said elevator is the elevator mentioned in said alternative writ, and is situated at Grand Harbor, a small way station on the line of

the Great Northern Railroad, containing a population of less than one hundred people; that there are two other elevators owned and operated by different owners independently of and in competition with each other; that there are about six hundred grain elevators, flat-houses, and warehouses in said State of North Dakota at which grain is bought and shipped for profit, which said elevators, warehouses, and flat-houses are owned and operated by over one hundred and twenty-five different owners independent of and in competition with each other; that the owners of said elevators, warehouses, and flat-house are individuals engaged in buying and shipping grain, millers who use their elevators to supply their mills with grain, farmers' shipping associations, elevator corporations, and individual farmers; that, said elevators, flat-houses, and warehouses vary in cost of construction from five hundred dollars to five thousand dollars, and vary in capacity from five thousand to fifty thousand bushels; that there are from two to ten elevators, warehouses, and flat-houses operated and owned each by different owners and operators at every station in North Dakota at which grain is marketed; that land upon which it is practicable to erect other elevators at every station in North Dakota at which grain is marketed is unlimited in area and can be readily purchased at prices varying from one dollar and twenty-five cents per acre to forty dollars per acre; that respondent's said elevator cost, when constructed and fully equipped, about three thousand dollars; that the capacity of the same is about 30,000 bushels.

"That respondent's principal business is that of buying wheat at Grand Harbor, North Dakota, and shipping the same to and selling it at Minneapolis and Duluth, Minnesota, to which business that of storing grain for third persons has been a mere incident.

"That all grain purchased by respondent at his said elevator is purchased for the sole purpose of being shipped to and sold at and is shipped to and sold at Minneapolis and Duluth, Minnesota.

"That respondent in the conduct of his said business contracts with millers and other purchasers of grain at said

Minneapolis and Duluth to sell and deliver to said persons at a future and fixed date certain quantities of wheat, and operates and maintains his said elevator for the exclusive purpose of purchasing grain to fill said contract.

"That in seasons when the grain yield is light and railroad facilities are such as to enable grain to be moved rapidly there is space and storage capacity in respondent's elevator in excess of that used by respondent's grain, and particularly when respondent's contracts for the sale of grain are small, while at other times, when the yield is enormous, as in the present year, respondent's contracts are large, and the quantities of grain presented for shipment are beyond the capacity of the railroads to move, there is not sufficient storage capacity in respondent's elevator to hold and store the grain purchased by respondent in the conduct of his said business.

"That there are located in Minneapolis and Duluth, Minnesota, a great many corporations, persons, and copartnerships engaged in a business known as the 'grain commission' business.

"That those grain commission houses have swarms of agents travelling throughout the State of North Dakota, going from town to town and farm to farm, purchasing grain from farmers in some instances and in others soliciting farmers to ship their grain to said houses at Minneapolis or Duluth, Minnesota, to be by the latter sold on commission.

"That none of said grain commission houses have or own any storage capacity in North Dakota.

"That if chapter 126 of the Laws of 1891 is valid and its effect is to compel respondent to receive all grain that may be tendered to him for storage by grain commission men, farmers, grain speculators, and others, without reference to the necessities or condition of respondent's business at any particular time, the entire storage capacity of respondent's elevator will be exhausted in storing grain for third persons, and the principal business of the respondent, to conduct which his capital was invested in said elevator, will be utterly ruined and annihilated for want of storage capacity to contain wheat purchased by him to fill contracts made by him in the conduct

of his said business, and respondent subjected to suits for damages for non-fulfilment of his said contracts.

"That the relator only offered to pay respondent for the service which he requested him to perform at the rate fixed by chapter 126 of the Laws of 1891 — that is, two cents per bushel; that respondent refused to perform the service for less than two and one-half cents per bushel.

"That respondent refuses to comply with the provisions of said chapter 126 on the ground that it abridges his privileges and immunities as a citizen of the United States; that it deprives him of his liberty and property without due process of law, and denies to him the equal protection of the laws, and amounts to a regulation of commerce among the States.

"That for thirteen years last past the rate charged for the storage of grain has been uniform at all elevators, flat-houses, and warehouses in North Dakota, and during that time did not exceed the following schedule: For receiving, elevating, insuring, delivering, and fifteen days' storage, two and one-half cents per bushel; after the first fifteen days, one-half cent per bushel for each fifteen days or part thereof, but not to exceed five cents per bushel for six months.

"That the average farm in North Dakota does not exceed in area 160 acres; that the average yield in grain of a quarter section of land in North Dakota does not exceed twenty-five hundred bushels; that a granary sufficient in size to safely and securely store twenty-five hundred bushels of grain can be erected on any farm in North Dakota at a cost not exceeding one hundred and fifty dollars.

"That the business of respondent and all other persons, firms, and corporations engaged in the business of operating grain elevators, warehouses, and flat-houses in North Dakota, and the manner in which said business is conducted is not in any manner unwholesome or deleterious to the health, morals, welfare, or safety of the community or society.

"That the railroad and warehouse commissioners of North Dakota, on page 33 of their annual report to the governor for 1890, said: 'In view of the fact that after thorough investigation the board deem the charges allowed by section 22, chap-

ter 187, (Laws 1890,) and also section 10 of said chapter, as unreasonable, the following rules of storage are recommended: 1, for receiving, elevating, insuring, delivering, and fifteen days' storage, two and one-half cents per bushel; 2, after fifteen days, one-half cent per bushel for each fifteen days or part thereof, but not to exceed five cents for six months.'

"That the rates referred to by said commissioners as unreasonable were less than the rate recommended by said board.

"That the respondent denies that the legislature has any power whatever to say whether he shall rent the bins in his elevator or not, and wholly denies the power of the legislature to say what he shall charge for the use of his said elevator or the bins therein.

"That since the enactment of section 9 of chapter 126 of the Laws of 1885 the amount of grain shipped directly by farmers without the intervention of elevators, warehouses, or flat-houses has been increasing, and in 1890, as respondent is informed, and believes, nearly fifty per cent of the entire grain product of North Dakota was shipped to Minneapolis and Duluth, Minnesota, by farmers; that the amount of grain shipped in that manner is steadily increasing from year to year.

"That pursuant to section 7 of chapter 122, Laws of 1890, the railroad commissioners adopted and published the following rules to govern the distribution of cars and other freight, which rules are now in operation in said State of North Dakota, to wit:

"'STATE OF NORTH DAKOTA,
"'OFFICE OF COMMISSIONERS OF RAILROADS.

"'Rules for the distribution of cars between stations and shippers.

"'1. In distributing cars to stations for grain loading they shall be distributed according to the daily average shipments from such stations.

"'2. In distributing cars to shippers for grain loading at stations agents shall first fill each shipper's order for one car to each. After this is done the balance of the cars shall be distributed among shippers according to the amount of grain in sight offered for shipment by each shipper.

" ' 3. Parties desiring to load grain on track shall be furnished cars and shall be allowed for loading time twenty-four hours from the time the car is set on the side track to complete loading and furnish shipping directions. In case shipper fails to complete loading or furnish shipping directions within twenty-four hours, then, in such case, the railway company may collect upon such cars $3.00 rental for each and every day or part of a day which such cars are delayed after twenty-four hours.

" 'The above rule as to time and rental charges shall also apply to grain delayed in unloading on track.'

" In connection with said rules in said report said commissioners said : ' We believe that the railroads have labored faithfully to supply cars to shippers, in accordance with these rules, and, so far as their ability to supply the demand permitted, cars have been distributed in conformity therewith. From September 15 to December 15 the demand for cars is double the ability of the roads to supply, and as a necessary consequence delay in supplying cars must ensue. In all cases of complaint as to failure to get cars investigated this year this has been the case, and cars have been supplied as soon as possible by the railroad companies.

" 'The liberal policy of the railroads in the distribution of cars adopted this year has been of great benefit to the farmers of North Dakota.'

" Wherefore respondent demands judgment quashing the alternative writ of mandamus, dismissing this proceeding, and for his costs and disbursements laid out and expended in this action."

To this return Stoeser interposed a general demurrer, which was sustained, and Brass electing in open court to stand on his return, a peremptory writ of mandamus was allowed. From this judgment an appeal was taken to the Supreme Court of Dakota, which court affirmed the order and judgment of the District Court, and remitted the record to that court. On May 28, 1892, final judgment was entered in the District Court, making the judgment of the Supreme Court the judgment of the District Court, and awarding a peremptory writ

of mandamus to execute that judgment. Whereupon Brass sued out a writ of error to this court.

*Mr. A. B. Browne,* (with whom was *Mr. A. T. Britton* and *Mr. J. F. McGee* on the brief,) for plaintiff in error.

*Mr. Halbert E. Paine* for defendant in error.

*Mr. C. D. O'Brien* filed a brief for defendant in error.

MR. JUSTICE SHIRAS delivered the opinion of the court.

In the 13th article of the constitution of the State of Illinois, adopted in 1870, all elevators or storehouses where grain or other property is stored for a compensation, whether the property stored be kept separate or not, were declared to be public warehouses, and it was made the duty of the general assembly to pass all necessary laws to give full effect to that article of the constitution. 1 Const. & Char. 490. By an act approved April 25, 1871, and entitled "An act to regulate public warehouses and the warehousing and inspection of grain, and to give effect to article 13 of the constitution of the State," the legislature of Illinois provided that those who conducted such public warehouses located in cities containing not less than one hundred thousand inhabitants should procure licenses and should give bond conditioned for compliance with the law; prescribed maximum rates for storing and handling grain ; and declared certain penalties for the failure to procure licenses.

The validity of this law was upheld by the Supreme Court of Illinois, *Munn* v. *People,* 68 Illinois, 80 ; and that judgment was affirmed by this court. *Munn* v. *Illinois,* 94 U. S. 113.

In June, 1888, the legislature of the State of New York passed an act entitled "An act to regulate the fees and charges for elevating, trimming, receiving, weighing, and discharging grain by means of floating and stationary elevators and warehouses in this State," Act of June 9, 1888, c. 581, whereby maximum charges were fixed for elevating, receiving,

weighing, and discharging grain, when the business was carried on in a city containing 130,000 inhabitants or upwards, and penalties imposed for disregard of the provisions of the statute. The owner of an elevator in the city of Buffalo was indicted, found guilty, and sentenced, in the Superior Court of Buffalo, for exacting charges for elevating grain in excess of the statutory rates. An appeal was taken to the Court of Appeals of the State of New York, which affirmed the judgment of the Superior Court of Buffalo. *Budd* v. *New York*, 117 N. Y. 1. A writ of error brought the case to this court, where the judgment of the Court of Appeals was affirmed. *Budd* v. *New York*, 143 U. S. 517.

The legislature of the State of North Dakota, by an act approved March 7, 1891, c. 126, Laws of 1891, p. 321, and entitled "An act to regulate grain warehouses and the weighing and handling of grain, and defining the duties of the railroad commissioners in relation thereto," enacted, in the fourth section thereof, that " all buildings, elevators, or warehouses in this State, erected and operated, or which may hereafter be erected and operated by any person or persons, association, copartnership, corporation, or trust, for the purpose of buying, selling, storing, shipping, or handling grain for profit, are hereby declared public warehouses, and the person or persons, association, copartnership, or trust owning or operating said building or buildings, elevator or elevators, warehouse or warehouses, which are now or may hereafter be located or doing business within this State, as above described, whether said owners or operators reside within this State or not, are public warehousemen within the meaning of this act, and none of the provisions of this act shall be construed so as to permit discrimination with reference to the buying, receiving, and handling of grain of standard grades, or in regard to parties offering such grain for sale, storage, or handling at such public warehouses, while the same are in operation;" and in the fifth section, "that the proprietor, lessee, or manager of any public warehouse or elevator in this State shall file with the railroad commissioners of the State a bond to the State of North Dakota, with good and sufficient sureties,

to be approved by said commissioners of railroads, in the penal sum of not less than $5000 nor more than $75,000, in the discretion of said commissioners, conditioned for the faithful performance of duty as public warehousemen, and a compliance with all the laws of the State in relation thereto ; " and in the eleventh section thereof, " the charges for storing and handling of grain shall not be greater than the following schedule: For receiving, elevating, insuring, delivering, and twenty days' storage, two cents per bushel. Storage rates, after the first twenty days, one-half cent for each fifteen days or fraction thereof, and shall not exceed five cents for six months. The grain shall be kept insured at the expense of the warehousemen for the benefit of the owner ;" and by the twelfth section it is provided that " any person, firm, or association, or any representative thereof, who shall fail to do and keep the requirements as herein provided, shall be deemed guilty of a misdemeanor, and shall, on conviction thereof, be subject to a fine of not less than two hundred dollars nor more than one thousand dollars, and be liable in addition thereto to imprisonment for not more than one year in the state penitentiary, at the discretion of the court."

In October, 1891, in the District Court of the Second Judicial District of the State of North Dakota, in proceedings the nature of which sufficiently appears in the previous statement of facts, the validity of this statute was sustained, and the judgment of that court was, on error, duly affirmed by the Supreme Court of the State. *Brass* v. *North Dakota*, 52 N. W. Rep. 408.

In the cases thus brought to this court from the States of Illinois and New York, we were asked to declare void statutes regulating the affairs of grain warehouses and elevators within those States, and held valid by their highest courts, because it was claimed that such legislation was repugnant to that clause of the eighth section of article 1 of the Constitution of the United States, which confers upon Congress power to regulate commerce with foreign nations and among the several States, and to the Fourteenth Amendment, which ordains that no State shall deprive any person of life, liberty, or property

without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

In the case now before us the same contentions are made, but we are not asked to review our decisions made in the previous cases. Indeed, their soundness is tacitly admitted in the briefs and argument of the counsel of the plaintiff in error. But it is said that those cases arose out of facts so peculiar and exceptional, and so different from those of the present case, as to render the reasoning there used, and the conclusions reached, now inapplicable.

The concession, then, is that, upon the facts found to exist by the legislatures of Illinois and New York, their enactments were by the courts properly declared valid, and the contention is that the facts upon which the legislature of North Dakota proceeded, and of which we can take notice in the present case, are so different as to call for the application of other principles, and to render an opposite conclusion necessary.

The differences in the facts of the respective cases, to which we are pointed, are mainly as follows : In the first place, what may be called a geographical difference is suggested, in that the operation of the Illinois and New York statutes is said to be restricted to the city of Chicago in the one case, and to the cities of Buffalo, New York, and Brooklyn in the other, while the North Dakota statute is applicable to the territory of the entire State.

It is, indeed, true that while the terms of the Illinois and New York statutes embrace in both cases the entire State, yet their behests are restricted to cities having not less than a prescribed number of inhabitants, and that there is no such restriction in the North Dakota law.

Upon this it is argued that the statutes of Illinois and New York are intended to operate in great trade centres, where, on account of the business being localized in the hands of a few persons in close proximity to each other, great opportunities for combinations to raise and control elevating and storage charges are afforded, while the wide extent of the State of North Dakota and the small population of its country towns and villages are said to present no such opportunities.

The considerations mentioned are obviously addressed to the legislative discretion. It can scarcely be meant to contend that the statutes of Illinois and New York, valid in their present form, would become illegal if the law makers thought fit to repeal the clauses limiting their operation to cities of a certain size, or that the statute of North Dakota would at once be validated if one or more of her towns were to reach a population of one hundred thousand, and her legislature were to restrict the operation of the statute to such cities.

Again, it is said that the modes of carrying on the business of elevating and storing grain in North Dakota are not similar to those pursued in the Eastern cities; that the great elevators used in transshipping grain from the Lakes to the railroads are essential; and that those who own them, if uncontrolled by law, could extort such charges as they pleased; and great stress is laid upon expressions used in our previous opinions, in which this business, as carried on at Chicago and Buffalo, is spoken of as a practical monopoly, to which shippers and owners of grain are compelled to resort. The surroundings in an agricultural State, where land is cheap in price and limitless in quantity, are thought to be widely different, and to demand different regulations.

These arguments are disposed of, as we think, by the simple observation, already made, that the facts rehearsed are matters for those who make, not for those who interpret, the laws. When it is once admitted, as it is admitted here, that it is competent for the legislative power to control the business of elevating and storing grain, whether carried on by individuals or associations, in cities of one size and in some circumstances, it follows that such power may be legally exerted over the same business when carried on in smaller cities and in other circumstances. It may be conceded that that would not be wise legislation which provided the same regulations in every case, and overlooked differences in the facts that called for regulations. But, as we have no right to revise the wisdom or expediency of the law in question, so we would not be justified in imputing an improper exercise of discretion to the legislature of North Dakota. It may be true that, in the

cases cited, the judges who expressed the conclusions of the court entered, at some length, into a defence of the propriety of the laws which they were considering, and that some of the reasons given for sustaining them went rather to their expediency than to their validity. Such efforts, on the part of judges, to justify to citizens the ways of legislatures are not without value, though they are liable to be met by the assertion of opposite views as to the practical wisdom of the law, and thus the real question at issue, namely, the power of the legislature to act at all, is obscured. Still, in the present instance, the obvious aim of the reasoning that prevailed was to show that the subject-matter of these enactments fell within the legitimate sphere of legislative power, and that, so far as the laws and Constitution of the United States were concerned, the legislation in question deprived no person of his property without due process of law, and did not interfere with Federal jurisdiction over interstate commerce.

Another argument advanced is based on the admitted allegation that the principal business of the plaintiff in error, in connection with his warehouse, is in storing his own grain, and that the storage of the grain of other persons is and always has been a mere incident, and it is said that the effect of this law will be to compel him to renounce his principal business and become a mere warehouseman for others. We do not understand this law to require the owner of a warehouse, built and used by him only to store his own grain, to receive and store the grain of others. Such a duty only arises when he chooses to enter upon the business of elevating and storing the grain of other persons for profit. Then he becomes subject to the statutory regulations, and he cannot escape them by asserting that he also elevates and stores his own grain in the same warehouse. As well might a person accused of selling liquor without a license urge that the larger part of his liquors were designed for his own consumption, and that he only sold the surplus as a mere incident.

Another objection to the law is found in its provision that the warehouseman shall insure the grain of others at his own expense. This may be burdensome, but it affects alike all

engaged in the business, and, if it be regarded as contrary to sound public policy, those affected must instruct their representatives in general assembly met to provide a remedy.

The plaintiff in error, in his answer to the writ of mandamus, based his defence wholly upon grounds arising under the constitution of the State and of the United States. We are limited by this record to the questions whether the legislature of North Dakota, in regulating by a general law the business and charges of public warehousemen engaged in elevating and storing grain for profit, denies to the plaintiff in error the equal protection of the laws or deprives him of his property without due process of law, and whether such statutory regulations amount to a regulation of commerce between the States. The allegations and arguments of the plaintiff in error have failed to satisfy us that any solid distinction can be found between the cases in which those questions have been heretofore determined by this court and the present one. The judgment of the court below is accordingly

*Affirmed.*

Mr. Justice Brewer, with whom concurred Mr. Justice Field, Mr. Justice Jackson, and Mr. Justice White, dissenting.

I dissent from the opinion and judgment of the court in this case. Reliance is placed in that opinion on *Munn* v. *Illinois*, 94 U. S. 113, and *Budd* v. *New York*, 143 U. S. 517. In the dissenting opinion I filed in the latter case, I expressed, so far as was necessary, my views in reference to the general propositions laid down in the two cases, and I do not desire to repeat what I there said. It is a significant fact that in *Sinking Fund Cases*, 99 U. S. 700, 747, and in *Wabash, St. Louis & Pacific Railway* v. *Illinois*, 118 U. S. 557, 569, Mr. Justice Bradley and Mr. Justice Miller, who concurred in the judgment in *Munn* v. *Illinois*, each sought to limit and qualify the scope of the language used by the Chief Justice in that case. These are the words of Mr. Justice Bradley:

"The inquiry there was as to the extent of the police power

in cases where the public interest is affected; and we held that when an employment or business becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen; in other words, when it becomes a practical monopoly, to which the citizen is compelled to resort, and by means of which a tribute can be exacted from the community, it is subject to regulation by the legislative power."

And this is the language of Mr. Justice Miller, delivering the opinion of the court:

"And in that case the court was presented with the question, which it decided, whether any one engaged in a public business, in which all the public had a right to require his service, could be regulated by acts of the legislature in the exercise of this public function and public duty, so far as to limit the amount of charges that should be made for such services."

I desire, however, specially to notice the facts disclosed by this record, and to point out to what extent the decision of this court now goes. The case, coming from the Supreme Court of the State of North Dakota, must be determined upon the record as it is presented. Nothing can be added to or taken from the facts as established by that record. The case was heard and determined upon a demurrer to the return made by the defendant to the petition and writ of mandamus, and of course upon such demurrer the facts stated in the return are to be taken as true. From that return it appears that along the line of the Great Northern Railroad in the State of North Dakota there are about six hundred grain elevators; that at Grand Harbor, a small way station on the line of that road, there are three elevators, one of them being that owned by the defendant; that defendant's elevator is a small one, with a capacity of 30,000 bushels, and costing about $3000. For aught that appears, the elevator was on the private property of the defendant, though contiguous to the railroad, and at the railroad station. It is further admitted:

"That respondent's principal business is that of buying wheat at Grand Harbor, North Dakota, and shipping the

same to and selling it at Minneapolis and Duluth, Minnesota, to which the business of storing grain for third persons is and always has been a mere incident.

" That all grain purchased by respondent at his said elevator. is purchased for the sole purpose of being shipped to and sold at and is shipped to and sold at Minneapolis and Duluth, Minnesota.

" That respondent in the conduct of his said business contracts with millers and other purchasers of grain at said Minneapolis and Duluth to sell and deliver to said persons at a future and fixed date certain quantities of wheat, and operates and maintains his said elevator for the exclusive purpose of purchasing grain to fill said contracts.

" That in seasons when the grain yield is light and railroad facilities are such as to enable grain to be moved rapidly there is space and storage capacity in respondent's elevator in excess of that used by respondent's grain, and particularly when respondent's contracts for the sale of grain are small, while at other times, when the yield is enormous, as in the present year, respondent's contracts large, and the quantities of grain presented for shipment are beyond the capacity of the railroads to move, there is not sufficient storage capacity in respondent's elevator to hold and store the grain purchased by respondent in the conduct of his said business.

" That if chapter 126 of the Laws of 1891 is valid, and its effect is to compel respondent to receive all grain that may be tendered to him for storage by grain commission men, farmers, grain speculators, and others, without reference to the necessities or condition of respondent's business at any particular time, the entire storage capacity of respondent's elevator will be exhausted in storing grain for third persons, and the principal business of respondent, to conduct which his capital was invested in said elevator, will be utterly ruined and annihilated for want of storage capacity to contain wheat purchased by him to fill contracts made by him in the conduct of his said business, and respondent subjected to suits for damages for non-fulfilment of his said contracts."

The rates which were established by law were as follows:

" 1.  For receiving, elevating, insuring, delivering, and twenty days' storage, two cents per bushel.

" 2.  After twenty days, one-half cent per bushel for each fifteen days or part thereof, but not to exceed five cents for six months."

It appears from these admissions that the principal business of defendant was that of buying wheat and shipping it to Minneapolis and Duluth for sale, and that he operated and maintained his elevator for the exclusive purpose of purchasing grain to fill his contracts ; and while at the time the elevator was not full and there was room for the storage of the grain tendered by the petitioner, and the defendant had at times used vacant space in his elevator for the storage of grain of others, yet such use was a mere incident to and subordinate to his principal business of buying and selling grain, for which principal business he exclusively maintained and operated his elevator.

Now, my first objection is that by this decision a party is compelled by the mandate of the court to engage in a business which he never intended to engage in, and which he does not desire to engage in, to wit, the business of maintaining a public elevator.  His business is that of buying and selling grain, and he operates and maintains the elevator, which he owns, for the exclusive purpose of carrying on that business. That he may have sometimes accommodated his neighbors by the use of his elevator for the storage of their grain, and thus to a limited extent engaged in that business, does not change the fact, as admitted, that his principal business was that of buying and selling, and that he operated and maintained that elevator exclusively for the carrying on of that business, or the other admitted fact that, if he is compelled, as he is compelled by this mandate, to receive grain as tendered so long as he has storage capacity unoccupied in his elevator, his principal business and that for which he built the elevator will be utterly ruined and destroyed.

The question is not whether, if he should receive and store in his elevator grain for others, he might not so far bring himself within the scope of the law as to be deemed for that

transaction engaged in the business of maintaining a public elevator, and thus bound by the charges fixed by statute; but whether, when he maintains an elevator exclusively for his own business, the fact that at times he has used vacant room in it for the storage of the grain of other persons, compels him to receive grain when tendered irrespective of the injury which it does to his own business. And it is admitted that, at the time of this tender, there was not sufficient storage capacity in his elevator to hold and store the grain purchased by him in the conduct of his business. And this is a matter of no trifling moment to one engaged in the business of buying and selling grain. He cannot know in advance when grain will be tendered at a price which will justify his purchase with a view to profit. The fact that to-day there may be storage capacity does not prove that to-morrow he may not need the entire capacity of his elevator. And yet, if, because to-day there is room in his elevator, he is bound to receive any grain that shall be tendered, he may to-morrow be unable to make purchase of the offered grain. It is a matter of common knowledge that grain is not put into and taken out of an elevator in an instant. And if once deposited the owner cannot be compelled to remove it, merely for the accommodation of the warehouseman, but may leave it there indefinitely so long as he pays the legal charges. The petition was for a writ of mandamus commanding the defendant "so long as the capacity of his said elevator is sufficient for the purpose, to store such grain as may be tendered to him by the relator," and the decree of the court was that the "writ issue as prayed for," and that is the decision which is affirmed by this court.

I dissent in the second place because the facts show, in the words of Mr. Justice Bradley, no "practical monopoly, to which the citizen is compelled to resort, and by means of which a tribute can be exacted from the community." Along the line of this single road within the limits of this State there are about six hundred of these elevators, owned and operated by over one hundred and twenty-five different persons, varying in cost of construction from $500 to $5000; at every station there is land purchasable by any one at prices varying

from $1.25 to $40 per acre, and a granary sufficient to store the average product of an ordinary Dakota farm can be erected at a cost of not exceeding $150. So it is that when any farmer or other individual can at a cost of less than $200 provide himself with all the facilities for storing and shipping the entire product of an ordinary farm, when along the line of a single railroad there are six hundred elevators already constructed, owned, and operated by one hundred and twenty-five different persons, when at every station at which grain is marketed there are from two to ten such elevators, it is held that there exists a monopoly such as justifies control by the public of the prices at which grain shall be stored in any one of these many elevators. If this be a monopoly, justifying public control of prices for service, I am at a loss to perceive at what point the fact of monopoly will cease and freedom of business commence. For obviously elevators along the line of that road were as plentiful as other institutions of industry, and as easily and cheaply constructed, and therefore savoring no more of monopoly.

I dissent in the third place because by this law the elevator man is bound not merely to receive, store, and discharge the grain which is tendered to him, but also to insure and pay the cost of insurance, it matters not what that cost may be, whether more or less than he receives for the whole service. I do not care to enlarge upon this matter. If the legislature can compel a party, though confessedly to the disadvantage, injury, and even destruction of his own special business of buying and selling grain, to receive and store grain for whoever may demand it in an elevator which he is maintaining and operating for the exclusive carrying on of his own business at any price which it sees fit to allow, and at the same time compel him to advance the money to insure the property thus forced upon him, I can only say that it seems to me that the country is rapidly travelling the road which leads to that point where all freedom of contract and conduct will be lost. For these reasons, thus briefly stated, I am constrained to dissent from this opinion and judgment.

I am authorized to say that MR. JUSTICE FIELD, MR. JUSTICE JACKSON, and MR. JUSTICE WHITE concur in this dissent.