[No. 19207.    En Banc.    February 25, 1926.]

THE STATE OF WASHINGTON, on the Relation of Stimson
Timber Company, Appellant, v. E. V. KUYKENDALL,
as Director of Public Works, et al.,
Respondents.[1]

[1] CARRIERS (2)—WHO ARE COMMON CARRIERS—TOWBOAT COM-
PANIES. Under Rem. Comp. Stat., § 10344, declaring "towboats"
operated "for the public use in the conveyance of persons or
property for hire over or upon the waters within this state" to
be common carriers, a towboat company is engaged in a public
use, where it appears that it was operating two towboats which,
according to its published tariff of rates, appear to be engaged
in practically all the different kinds of work feasibly performed
by a towboat.

[2] CONSTITUTIONAL LAW (134)—DUE PROCESS OF LAW—REGULATION
OF TOWAGE RATES. Rem. Comp. Stat., § 10344 et seq., authoriz-
ing the department of public works to fix the schedule of rates
to be charged by common carriers, including therein towboats,
does not contravene the constitutional restrictions against taking
property without due process of law, since the business was
affected with a public interest, or devoted to a public use; and
whether a monopoly actually existed is not a controlling ques-
tion.
TOLMAN, C. J., BRIDGES, and MACKINTOSH, JJ., dissent.

Appeal from a judgment of the superior court for
Thurston county, Wright, J., entered January 15, 1925,
affirming an order of the department of public works
fixing rates for towage of logs, after a trial on the
merits to the court.    Affirmed.

*Reynolds, Ballinger & Hutson,* for appellant.

*The Attorney General* and *H. C. Brodie, Assistant,*
for respondents.

*Oakley & Thompson, amici curiae.*

ASKREN, J.—This is an appeal from a judgment of
the superior court affirming the findings of the depart-

[1]Reported in 243 Pac. 834.

ment of public works, after hearing upon the question of the reasonableness of a tariff rate for towing logs.

Appellant is engaged in the logging of timber on Puget Sound. In its operations, it is required to have its logs towed from Clifton, in Mason county, to Union Bay, in King county. The rate provided in the tariff is $25 per section. Appellant has been having its towing done by different tugboat companies at a charge of approximately $16.50 per section, and, at the time of the hearing, had a verbal contract with the Shively Towboat Company to do its work for that amount. Evidence was introduced upon the question of the reasonableness of the rate, and the department found that the $25 rate was reasonable and just under all the circumstances.

It will be unnecessary to detail all the evidence presented upon which the department's findings were based, but is sufficient to say that the findings conclusively established that the Shively Towboat Company, although towing and agreeing to tow the logs at the rate of $16.50 per section, could not continue to do so except at a loss.

There are a great many factors which go to make up the overhead and running expenses of the towboat business which the towboat company had either failed or refused to take into consideration, which, if adopted, conclusively established that the logs could not be towed at a profit for $16.50 per section. A careful examination of the record demonstrates that the price fixed by the department was reasonable under all the evidence adduced.

The most serious objection raised by appellant, however, arises, not so much upon the amount of the rate established as upon the question of whether any rate at all could legally be established. Appellant strenu-

ously contends that a towboat engaged in the towing of logs is not devoting its property to a public use, so as to make it a common carrier within the purview of the controlling statutes (Rem. Comp. Stat. § 10344) or in a business "affected with a public interest," as defined by this and other courts of last resort. The statutes controlling are as follows:

Section 10344: "The term 'common carrier,' when used in this act, includes all railroads, . . . steamboat companies, . . . and every corporation, company, association, joint stock association, partnership and person, their lessees, trustees or receivers appointed by any court whatsoever, and every city or town, owning, operating, managing or controlling any such agency for public use in the conveyance of persons or property for hire within this state. . . .

"The term 'steamboat company,' when used in this act, includes every corporation, company, association, joint stock association, partnership and person, their lessees, trustees or receivers appointed by any court whatsoever, owning, controlling, leasing, operating or managing any vessel over and upon the waters of this state. . . .

"The term 'vessel,' when used in this act, includes every species of water craft, by whatsoever power operated, for the public use in the conveyance of persons or property for hire over and upon the waters within this state, including tow boats, tugs, scows, barges and lighters (excepting row boats and sailing boats under twenty gross tons burden, open steam launches of five tons gross and under, and vessels under five gross tons propelled by gas, fluid, naphtha or electric motors).

"The term 'public service company,' when used in this act, includes every common carrier, . . . as such terms are defined in this section."

Section 10345 reads in part as follows:

"All charges made for any service rendered or to be rendered in the transportation of persons or property, or in connection therewith, by any common carrier, or

by any two or more common carriers, shall be just, fair, reasonable and sufficient. . . . ''

Section 10350 reads in part as follows:

''Every common carrier shall file with the commission and shall print and keep open to the public inspection schedules showing the rates, fares, charges and classification for the transportation of persons and property within the state between each point upon its route and all other points thereon. . . . ''

Section 10352 reads in part as follows:

''The names of the several carriers which are parties to any joint tariff shall be specified therein, and each of the parties thereto, other than the one filing the same, shall file with the commission such evidence of concurrence therein or acceptance thereof as may be required or approved by the commission. . . . ''

Section 10354 reads in part as follows:

''No common carrier shall charge, demand, collect or receive a greater or less or different compensation for transportation of persons or property, or for any service in connection therewith than the rates, fares and charges applicable to such transportation as specified in its schedules filed and in effect at the time; . . . ''

Section 10356 reads as follows:

''No common carrier shall, directly or indirectly, by any special rate, rebate, drawback, or other device or method, charge, demand, collect or receive from any person or corporation a greater or less compensation for any service rendered or to be rendered in the transportation of persons or property except as authorized in this act, than it charges, demands, collects or receives from any person or corporation for doing a like and contemporaneous service in the transportation of a like kind of traffic under the same or substantially similar circumstances and conditions.''

It will be seen, from the above quoted sections, that certain properties are declared by statute to be com-

mon carriers; that among these properties are steamboat companies; that the word "vessel," as used in the act, includes any "towboat" operated "for the public use in the conveyance of persons or property for hire over and upon the waters within this state."

It is contended that at common law towboats were not considered common carriers, and that, therefore, they could not be so considered here. It may be admitted that at common law towboats were not common carriers by the weight of authority; but that authority has no controlling force in our present inquiry, for we must determine whether, under the statute, a towboat is a common carrier. Since the statute says that a towboat operated for a public use is a common carrier, it remains only to be determined whether or not the towboats in question were engaged in a public use.

[1] The evidence shows that the towboat company has two boats, and some barges, which it uses in its business. The business of the appellant is sufficient to take the greater portion of the time of the larger of these towboats. The towboat company, in common with a large number of like companies, in compliance with the law heretofore quoted, filed its tariff of rates for towing. This tariff provides for a wide and varying schedule for work on Puget Sound, governed by different zones. The tariff provides rates, not alone for the towing of logs, but for the towing of piling, boom sticks, ships, dismantled vessels, scows, barges, pile drivers, dipper dredges, suction dredges, and rates per hour for assisting, shifting and docking vessels, scows and barges. It will thus be seen that by its tariff the towboat company is engaged in practically all the different kinds of work which can feasibly be performed by a towboat. It must be apparent that one who holds

himself out to the world, through a regularly filed tariff, as willing to perform all the manifold forms of towing which the public may reasonably be expected to require, is devoting his property to a public use. It is difficult to see how they could be more fully devoted to the public use. Appellant contends that it was not the intention, nor within the province of the legislature, to place towboats under the provisions of this act and make them common carriers. That it was the intention of the legislature to do so is demonstrated by words so clear and unambiguous as to be beyond cavil. Whether it was within the province of the legislature so to do, without the act being unconstitutional as urged by appellant, is another question.

[2] The principal objection raised to the constitutionality of this statute centers around the provision of the Federal constitution that no property shall be taken without due process of law. Appellant admits that there are certain instances where private property may be regulated, even to the point of specifying the rates to be charged for services, where such businesses are affected with a public interest, or devoted to a public use, but contends that the towboat business is not of that character.

The leading case in this country upon the question of the right to regulate the rates charged for service is *Munn v. Illinois,* 94 U. S. 113. In that case the legislature of Illinois passed an act providing that all elevators or warehouses accepting grain for storage for compensation were declared to be public warehouses, and the rates subject to regulation. The act being upheld by the supreme court of Illinois, the case was appealed to the United States supreme court, where, in a very able and exhaustive opinion, the constitutionality of the act was upheld. The decision was

grounded upon the fact that the storage of grain in elevators was a business affected with a public interest, and therefore subject to regulation.

The same question came before the same tribunal in *Budd v. New York,* 143 U. S. 517, where the court, after reviewing a large number of decisions of other courts of last resort, as well as its own, that had been made in the intervening period of time (sixteen years), held that the act of the New York legislature, similar to that of the Illinois legislature, was constitutional; that it did not contravene the provisions of the Federal constitution; and reaffirmed the doctrine that the handling of grain and the storage thereof in warehouses was a business affected with a public interest. Two years later, there was presented to the same court the right of the legislature of North Dakota to enact a law of similar character. In that opinion, *Brass v. State of North Dakota ex rel. Stoeser,* 153 U. S. 391, the court again reaffirmed its previous decision in *Munn v. Illinois, supra,* and *Budd v. New York, supra.* The appellant in that case sought to distinguish the facts therein from the Illinois and New York cases, upon the ground that in both of them the act regulated warehouses or elevators in large commercial centers, where the danger of monopoly was great and apparent, whereas, in the North Dakota case the act applied to the whole state. Attention was called to the fact that land was cheap in North Dakota, and that it was possible to have elevators at a very moderate price in any section of the state, and that the state of facts demonstrated that there could be no monopoly. The supreme court, however, refused to accept this as a distinction, and pointed out that, if the Illinois statute and the New York statute had applied to the whole state rather than to large commercial centers like

Chicago and Buffalo, the act would still be constitutional. The court called attention to the fact that these different situations were proper matters to be addressed to the legislature, since upon them devolved the determination of the policy of the law; but that it could have no controlling effect upon courts whose duty is confined to a consideration of the power of the legislature to pass a law, not as to its wisdom or the soundness of its policy. In these cases will be found the keynote for our consideration of the questions here presented.

Appellant urges that the situation presented in the case at bar arose, not through a monopoly of the tugboat owners who had raised the price of towing to those who required such services, but that the legislation was enacted at the behest of the towboat owners themselves, who desired to be regulated. It was said in argument that to justify the legislature in passing this law a monopoly must be apparent; that a condition must exist that requires the intervention of the hand of the legislature for the protection of the public. But, as we have seen from the foregoing decisions, the question of whether or not a monopoly actually existed is not a controlling feature. Nor can courts know what considerations were pressed upon the legislature to justify the passage of the act. It is enough for us to follow the holding in *Munn v. Illinois, supra,* where the court said:

"For our purpose we must assume that, if a state of facts could exist that would justify such legislation, it actually did exist when the statute now under consideration was passed. For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the state. But if it could we must

20—137 WASH.

presume it did. Of the propriety of legislative interference within the scope of the legislative power, the legislature is the exclusive judge.''

It will readily be seen, then, that it makes no difference whether a monopoly existed, or whether a demand for the regulation came from the people who elected their representatives, from the towboat owners, or from those who require their services. It seems too plain for argument that, if the prices charged were exorbitant, it would vitally affect what is one of the largest industries of the state of Washington (the timber business); that the cost of transporting logs would be reflected in every foot of lumber, and that the public would have such an interest in it that the legislature, in the interests of the public, should have the power to regulate the price to be charged. Courts have always been quick to uphold the rights of private property, but never at the cost of disregarding the rights of the general public to be protected against the use of private property, whenever it appeared to affect the public interests. Thus in *German Alliance Insurance Co. v. Kansas,* 233 U. S. 389, there was presented to the court the constitutionality of an act of the state of Kansas, which regulated rates to be charged by insurance companies. All of the arguments presented in this case were presented in that, yet the court held that the insurance business was one which was affected with a public interest, and subject to control. The reasons advanced for holding the statute unconstitutional are not materially different from those urged in *Munn v. Illinois; Budd v. New York,* and *Brass v. Stoeser, supra,* and they are ably reflected in the dissenting opinions filed in each of those cases. That they are cogent, illuminating and persuasive cannot be denied. But they were not controlling with the majority of the court, and therefore did not establish

the law applicable to the facts. There was stressed to the court the newness of the doctrine, and the danger of its extension to the point of wiping out private property. Answering this objection, the court said: . 

"Against that conservatism of mind, which. puts to question every new act of regulating legislation and regards the legislation invalid or dangerous until it has become familiar, government—state and national —has pressed on in the general welfare; and our reports are full of cases where in instance after instance the exercise of regulation was resisted and yet sustained against attacks asserted to be justified by the constitution of the United States. The dread of the moment having passed, no one is now heard to say that rights were restrained or their constitutional guaranties impaired."

In *Terminal Taxicab Co. v. District of Columbia,* 241 U. S. 252, there was presented the question of whether a taxicab company came within the jurisdiction of the public utilities commission of the District of Columbia, the act creating which provided that it included as common carriers "all express companies, and every corporation controlling or managing any agency for public use for the conveyance of persons or property within the District of Columbia for hire." The court held that the business of the taxicab company was a public utility by ancient usage and understanding, as well as a common carrier within the meaning of the act. In the case at bar, it was urged that a towboat, while engaged in the towing of logs for appellant, handled only business for one person at a time. The same objection was urged in the case just cited, the court holding that the fact that a taxicab company conveys only one group of customers in a vehicle at a time made it none the less an agency for public use in the conveyance of persons. It was also urged that it limited its services to guests of a certain hotel. The court said:

"We do not perceive that this limitation removes the public character of the service, or takes it out of the definition in the act. No carrier serves all the public. His customers are limited by place, requirements, ability to pay and other facts. But the public generally is free to go to hotels if it can afford to, as it is free to travel by rail, and through the hotel door to call on the plaintiff for a taxicab. We should hesitate to believe that either its contract or its public duty allowed it arbitrarily to refuse to carry a guest upon demand. We certainly may assume that in its own interest it does not attempt to do so. The service affects so considerable a fraction of the public that it is public in the same sense in which any other may be called so. *German Alliance Insurance Co. v. Kansas,* 233 U. S. 389. The public does not mean everybody all the time. See *Peck v. Tribune Co.,* 214 U. S. 185."

Appellant lays some stress upon the decision in *Producers Transportation Co. v. Railroad Commission,* 251 U. S. 228. In that case, the state of California declared that any pipe line, used for the transportation of crude oil for the public for hire, and which was constructed and maintained upon any public highway, should be deemed a common carrier. The court found that the pipe line had been used in carrying oil for other persons for hire, and that its articles of incorporation allowed it to engage in a public business; and that it had exercised the right of eminent domain. It was said in the court's opinion:

"It is, of course, true that if the pipe line was constructed solely to carry oil for particular producers under strictly private contracts and never was devoted by its owner to public use, that is, to carrying for the public, the State could not by mere legislative fiat or by any regulating order of a commission convert it into a public utility or make its owner a common carrier; for that would be taking private property for public use without just compensation, which no State can do consistently with the due process of law clause

of the Fourteenth Amendment. [Citing many cases.] On the other hand, if in the beginning or during its subsequent operations the pipe line was devoted by its owner to public use, and if the right thus extended to the public has not been withdrawn, there can be no doubt that the pipe line is a public utility and its owner a common carrier whose rates and practices are subject to regulation. *Munn v. Illinois, supra.*"

Nor do we think any similarity can be established between the case at bar and that of *Michigan Utilities Commission v. Duke,* U. S. Adv. Ops. 1924-25, p. 207, decided January 12, 1925.

In that action, the appellant was engaged wholly and solely in the business of hauling automobile bodies from Detroit, Michigan, to Toledo, Ohio, under private contract. He filed no schedule of rates; he hauled for no one except the three manufacturers with whom he had contracts; he did not undertake, nor did he haul, for the public generally, nor for such as desired his services. As the court said: "He had no other business and did not hold himself out as a carrier for the public."

Even under these last two decisions relied upon by appellant, the towboat company is a common carrier, for it has filed its schedule of rates for the public, and is devoting its property to a public use generally.

There are four points of similarity between the case at bar and the elevator cases cited: (1) The important character of the article of commerce in which the public has an interest; (2) the number of such articles of commerce affected thereby; (3) the question of whether or not, in performing the service, private property alone is used; and (4) the question of transportation.

As to the first point, the similarity, it is a matter of common knowledge that the lumber industry of the

state of Washington is as important an article of commerce to the people of the state as that of wheat to the states of New York, Illinois or North Dakota.

As to the second, while it appears that wheat was the main article of commerce stored in the elevators, we may assume, for the purpose of argument, that other grains were stored therein. In the case at bar, while the towing of logs may be the greater share of the business of towboat companies on Puget Sound, yet it is common knowledge that many other manifold services are performed by towboats, and the schedule shows that the Shively Towboat Company performs a general towing business.

Upon the third point, in all of the elevator cases the elevator buildings were not only privately owned, but were upon private property, and used no portion of the public highways in the prosecution of their enterprises. In the case at bar, the towboats operate wholly and exclusively upon the waters of Puget Sound, a public highway, over which the state has jurisdiction, subject only, of course, to the primary regulation of the Federal government itself.

Upon the fourth point, storage of grain is not necessarily a matter of transportation. While it is true that storage is incident to its transportation, in that it provides a resting place for the grain upon its journey, it was not held to be essentially transportation, as that word is generally used and regarded in cases of this character.

In the case at bar the business of the towboat company is wholly transportation. Its transportation of logs from one point to another on Puget Sound cannot be essentially different from the transportation of logs upon land by a railroad company from one point to another. The fact that it has no fixed termini is un-

important. While it permits greater latitude in the disposition or handling of its business, it cannot change its character. From the earliest times, the transportation of property or intelligence has always been understood to be affected with a public interest. If a passenger steamboat carrying passengers for hire, under a regularly filed schedule of rates, and plying between certain ports, is a common carrier; if a freight boat leaving from the same dock and carrying freight for hire to certain ports of call under regularly filed tariffs is a common carrier, we see no reason why a towboat, leaving from the same dock, and towing all manner of property for hire, under a regularly filed tariff, to certain ports of call, or within certain zones, is not also a common carrier under the statute.

The judgment is right and it is therefore affirmed.

HOLCOMB, FULLERTON, MAIN, MITCHELL, and PARKER, JJ., concur.

BRIDGES, J. (dissenting)—In the early part of its opinion, the court decides that one who tows logs and lumber on the waters of Puget Sound is engaged in the business of a common carrier. If so, it seems to me that the argument should have stopped there, for everyone will admit that the state has a right to fix rates to be charged by a common carrier. But I have seriously doubted the correctness of the conclusion reached by the court. At common law, the business of towing lumber and other products was regarded as a private enterprise, and not subject to the strict rules applicable to a common carrier. A common carrier is such only because of the nature of the business done and the services rendered. The legislature may not make one a common carrier by simply declaring him to be such. These towboats have no fixed schedule, do not operate over roads built and maintained by the

public, and have no termini. They serve only a very small minority of the public. The nature of their business makes it impossible for them to act for more than one person at a time. They come and go whenever and wherever business calls them. They operate only at the request of one person. They go to the business, and not the business to them. On the other hand, to be fair in our argument, it should be conceded that they are engaged in transportation, and that that business, generally speaking, but not always, constitutes one a common carrier. They also use the public waters. I concede that these are elements from which it can be argued, with some show of reason, that they are common carriers.

But the court asserts that, regardless of what these boats might be in the absence of legislation, the legislature of this state has seen fit to make them common carriers. It is true that the act includes vessels and defines towboats as vessels, but it undertakes to regulate them only while engaged in the "public service." This, it seems to me, is shown by the act, which defines what a common carrier is, and says that it includes all steamboats operating "for public use." But I shall not seriously quarrel with the court's determination that a tower of logs or lumber is a common carrier. I admit the question is not without doubt. If this were all there was in the opinion, I might, in aid of uniformity, be able to resolve my doubts in favor of the view taken by the majority of the court. But I am more deeply interested in another feature of the opinion, and that is the regulation of private property and business.

After holding that the business of towing is that of a common carrier, the court proceeds to hold, as I read the opinion, that the state may regulate the charges to be made for services by what has heretofore been

regarded as a purely private business, provided that business *"is affected with a public interest."* This, to my mind, is a very important and far-reaching decision. If I remember my history correctly, it is stated that many of our forefathers came to our shores in order that they might have freedom of private contract and be able to transact their private businesses without interference from the sovereign power, except as that business might be affected by the police power of the state. These ideas were written into the Federal constitution. Thenceforward this government stood for the rights of the individual as distinguished from paternalism in government, and the courts prided themselves in their effort to uphold those rights. I am afraid, however, that this portion of our governmental structure is beginning to slip from its true foundation.

If private business is ever to be regulated by the state, then I do not like the rule that it may be regulated, when it "is affected with a public interest." It seems to me that the measure is too uncertain, too elastic, and too embracing. Everything the individual does affects, directly or indirectly, the public, and therefore what he does is "affected with a public interest." The people of a given community are more deeply and closely affected by the charges made by the local grocer for his products, by the clothiers, by the butcher shops, by the saw mills, by every person who produces building materials or handles the necessities of life, than with the charges made by one who tows logs or lumber on Puget Sound. Under this rule of public interest, where are we to stop? The opinion says "that the cost of transporting logs would be reflected in every foot of lumber," and for that reason the business "is affected with a public interest." Certainly not more so than the charges made by the grocer, for they affect every man, woman and child in the com-

munity, and the wage of every laborer must be based thereon. I do not see why the rule laid down by the court would not justify the state in fixing the price of coal, wood, logs, lumber, and all the necessities of life; and thus would the rights of private property and business be wiped out. Again, I ask, where are we to stop under this rule? When may a private business be considered as "affected with a public interest," and when not? It is my inability to answer these questions that leads me to doubt the wisdom of the rule laid down by the court. I am afraid we are leaving the main highway and are taking a side road, which must eventually lead only into someone's private barnyard.

It is my present idea that the only safe rule is that the state may regulate charges and rates only where the business sought to be regulated has received from the state some special benefit or privilege that is not possessed by others; as, for example, where the owner of the business has been given the power of eminent domain, a franchise, a license, an exclusive right, the privilege of using the public grounds or public highways, and probably there could also be regulation of those who hold themselves out as common carriers and willing, as such, or otherwise, to serve the public. In these instances the state has given something of value which belonged to the public, and that justifies it in reserving the right to regulate the business for the benefit of the public.

I concede that the rule suggested by me would prohibit charge or rate control by the state of all businesses which are commonly called private; but may we not confidently rely on competition to protect the general public from any serious detriment?

Of course, I am not here taking into consideration the right of the state to regulate private business and property by virtue of its police power, a right which

it had before, and has independent of, any constitutional provision. It may be that under this power the state may regulate the prices of a strictly private business which has become, or threatens to become, a monopoly.

TOLMAN, C. J., and MACKINTOSH, J. concur with BRIDGES, J.