RYAN *v.* TERMINAL CO.

*(Nashville.* March 15, 1899.)

1. RAILROAD TERMINAL COMPANY. *Right of eminent domain.*

A railroad terminal corporation, chartered and organized "to facilitate the public convenience and the safety of the transmission of railroad passengers and freight, and to prevent unnecessary expense, inconvenience, and loss to the public," and authorized, for this purpose, to acquire all necessary real estate, and to lay all necessary tracks and erect all necessary buildings, is charged with a public use, and may be authorized by statute to condemn such private property as is absolutely necessary to enable it to accomplish the purposes of its organization. (*Post, pp. 113–126.*)

Act construed: Acts 1893, Ch. 11.

Cases cited and approved: Railroad *v.* Cowardin, 11 Hum., 348; Railroad *v.* Tel. Co., 101 Tenn., 62; 153 U. S., 391; 49 Mo., 165; 47 N. Y., 150; 53 Cal., 223; 4 Ohio St., 308; 43 N. J. L., 381; 136 Mass., 75; 53 Ala., 211.

Cited and distinguished: Harding *v.* Goodlett, 3 Yer., 40; Clack *v.* White, 2 Swan, 540; Memphis Freight Co. *v.* Memphis, 4 Cold., 419.

2. EMINENT DOMAIN. *Right of exercise, how determined.*

The declaration of the Legislature that a use is public is persuasive, but not conclusive, with the Courts. The legislative declaration in favor of the exercise of eminent domain in aid of a use that is public, is conclusive. (*Post, pp. 116, 117.*)

Cases cited and approved: Anderson *v.* Turbeville, 6 Cold., 161; 21 W. Va., 534.

3. PUBLIC USE. *What is.*

The term "public use" is a flexible one, and not easily susceptible of exact definition. It varies and expands with the growing needs of a more complex social order. In general, a public use

may be predicated of anything which will satisfy a reasonable
public demand for public facilities for travel or transmission
of intelligence or commodities, and of which the general pub-
lic, under reasonable regulations, will have a definite and fixed
use, independent of the will of the party in whom title is vested.
But the mere fact that an enterprise will result in some con-
venience to the public—conferring incidental benefits upon
the public by affording additional facilities for trade or manu-
facture—will not make the character of the use public. (*Post*,
*pp. 118–122.*)

4. SAME. *Same. Example.*

That the charter of a railroad terminal company fixes no rates
to be charged for the use of its property does not stamp it as
a private enterprise. "The corporation and its property being
affected by a public use will be under governmental control,
and the Legislature may at any time fix rates and make more
specific the duties clearly implied from the Act of incorpora-
tion." (*Post, pp. 124, 125.*)

Cases cited and approved: 94 U. S., 113; 143 U. S., 517; 153 U. S.,
391.

5. SAME. *Same.*

An enterprise is not degraded from its public character by the
fact that the parties instituting it had private profit primarily
in view. (*Post, p. 125.*)

6. CONSTITUTIONAL LAW. *Railroad terminal Act.*

A statute authorizing the chartering of railroad terminal cor-
porations, stamping them with a public use, and giving them
power of eminent domain, if enacted under a sufficient title
for these purposes, is not rendered unconstitutional by reason
of an incidental provision that such companies might maintain
hotels, restaurants, and news stands in their passenger sta-
tions for the public convenience. (*Post, pp. 125, 126.*)

Act construed: Acts 1893, Ch. 11.

7. SAME. *Same. Title and subject of Act.*

A statute which, under the title "An Act to amend an Act, enti-
tled an Act to provide for the organization of railroad terminal
corporations, and to define the powers, duties, and liabilities
thereof," enacts, *inter alia*, that railroad companies contract-
ing for use of the facilities of terminal companies, shall have
power to own stock and bonds of such terminal companies,

Ryan *v.* Terminal Co.

and to guarantee their bonds and other contracts, is not unconstitutional as grouping foreign or incongruous matters under its title. (*Post, pp. 126–130.*)

Constitution construed: Art. II., Sec. 17.

Act construed: Acts 1893, Ch. 11.

Cases cited: Cannon *v.* Mathes, 8 Heis., 504; Luehrman *v.* Tax. Dist., 2 Lea, 426; Merrill *v.* Fickle, 3 Lea, 79; Frazier *v.* Railroad, 88 Tenn., 156; *Ex parte* Griffin, 88 Tenn., 550; Cole Mfg. Co. *v.* Falls, 90 Tenn., 469; State *v.* Yardley, 95 Tenn., 554; Ragio *v.* State, 86 Tenn., 272; Bank *v.* Devine Grocery Co., 98 Tenn., 603.

---

FROM DAVIDSON.

---

Appeal in error from Circuit Court of Davidson County.   J. W. BONNER, J.

JAS. RYAN for Ryan.

DICKINSON & WALLER and MOORE & McNALLY for Terminal Co.

BEARD, J.   This is a proceeding instituted by the Louisville & Nashville Terminal Company, a corporation chartered and organized under Ch. 11 of the Acts of the General Assembly of 1893, seeking an order of condemnation, under the laws of eminent domain, of certain real estate, the property of plaintiff in error, in the city of Nashville.

The avowed purpose of this Act was to authorize the creation of railroad terminal corporations "to facilitate the public convenience and the safety of

18 P—8

the transmission of railroad passengers and freight, and to prevent unnecessary expense, inconvenience, and loss to the public." To this end it is provided that a corporation organized under the Act had the "power to acquire, . . . at such place or places as shall be found expedient, such real estate as may be necessary on which to construct, operate, and maintain passenger stations, comprising passenger depots, office buildings, sheds, and storage yards; and freight stations, comprising freight depots, warehouses, offices and freight yards, roundhouses, and machine shops; also main and side tracks, switches, crossovers, turnouts, and other terminal railroad facilities . . . suitable in size, location, and manner of construction to perform promptly and efficiently the work of receiving, delivering, and transferring all passenger and freight traffic of railroad companies with which it may enter into contracts for the use of its terminal facilities." The Act conferred upon the corporation, when real estate required by it could not be obtained by purchase, the power to acquire it "by condemnation, in pursuance of the general law authorizing the condemnation of private property for works of internal improvement."

After obtaining its charter, as the record discloses, the present company entered into an important contract with the municipal authorities of Nashville, by which there was conceded to it the right to operate and extend existing railroad tracks, and

to construct such additional tracks as it might see fit, and to construct and maintain a passenger station or stations or depots for the handling of freight, and approaches to such passenger and freight stations and depots over, under, along, and across . . . the streets, alleys, and roads of the city of Nashville, within prescribed limits, upon conditions which need not be mentioned, except that the contract was not to be operative unless the obligations assumed by the terminal company were first guaranteed by the Louisville & Nashville Railroad Company and the Nashville, Chattanooga & St. Louis Company, which guarantees, the record shows, have been made.

Acting under the authority of its charter and this contract, the corporation began operations, and, in carrying out its enterprise, found, by the averments of the petition, which, not being denied, are taken to be true, that the property of the plaintiff in error was absolutely necessary in order to enable it to accomplish the purpose of its organization, and that it was situate within the limits defined by its contract with the city. Failing in its effort to purchase this property from plaintiff in error, it asked the aid of the Court in condemning the same in manner and form as the statutes prescribed.

Over the objections of plaintiff in error, made by exceptions to the reports of the jury of view, the cause progressed to a judgment of condemnation, from which an appeal, in the nature of a writ of error, has been taken to this Court.

While the questions made in this Court could not, as a matter of proper practice, be raised on exceptions to the report of the jury of view, yet we think they arise upon the face of the petition, so that, upon this appeal, they may be considered and determined by us.

No error is assigned on the ground of irregularity of these proceedings. The objections lie deeper than this; they challenge on constitutional grounds the corporate existence of defendant in error, and, if it have a legal existence, then its right to exercise the right to condemn private property under the doctrine of eminent domain.

While there are several assignments of error to the action of the Court below we think they are reducible to these two. We will deal with these objections in the inverse order of their statement.

1. Is the use contemplated by Chapter 11 of the Acts of 1893 a public use? If so, then the defendant in error, so far as this question is concerned, is entitled on this record to the judgments of condemnation pronounced in the Circuit Court. That the Legislature regarded the use as a public use, and, by necessary implication, so declared it, is evident; this, however, is not conclusive. The necessity for and the expediency of the exercise of the right of eminent domain are questions political in their nature, and when it has been once determined by the legislative branch of the government that they exist, this determination is conclusive. Cooley

on Con. Lim., 538; *Anderson* v. *Turbeville*, 6 Cold., 161. And while the Legislature must, in the first instance, pass on the use and fix its character, and while its recognition of the use as a public necessity is entitled everywhere to the benefit of strong presumptions (*West Penn. Inst.* v. *Edgewood R. R.*, p. 79, pr. 257; *Varner* v. *Martin*, 21 W. Va., 534), yet the duty is devolved on the Courts, in the last resort, of determining whether the particular use is a public use within the legal meaning of the term. Mills on Em. Dom., Sec. 10; Lewis on Em. Dom., Sec. 158; 3 Ell. on Railroads., Sec. 952.

The Constitution does not define a public use; it simply provides that no man's property shall be "taken or applied to public use . . .. without just compensation being made therefor," clearly implying that it shall not be taken for a private use under any conditions. So far as we have discovered, other State Constitutions in this regard are similar to ours. The Courts have equally avoided a definition lest it prove an embarrassment in subsequent cases and work mischief in practical application. Lewis on Em. Dom., Sec. 159. They have not sought to fix a positive standard for the measurement of a public use, and, in the nature of the subject, possibly could not do so. *Paxton* v. *Farmers' Ins. Co.*, 29 L. R. A., 853.

However, even with this lack the subject "is not at large." It has been so long and in such a variety of cases a matter of judicial inquiry there is

now little difficulty in assigning a particular case to its proper place and confining the right of eminent domain within natural boundaries.

The term "public use" is a flexible one. It varies and expands with the growing needs of a more complex social order. Many improvements universally recognized as impressed with a public use were nonexistent a few years ago. The possibility of railroads was not dreamed of in a past not very remote, yet when they came the Courts, recognizing the important part they were to perform in supplying a public want, did not hesitate to take control of them as quasi-governmental agents and extend to them the right of eminent domain in order to equip them thoroughly to discharge the duties to the community which followed their grant of franchises. This is equally true as to other appliances which now form important parts of a rapidly widening system of social and commercial intercommunication. So it may be said at the present time that "anything which will satisfy a reasonable public demand for public facilities for travel or for transmission of intelligence or commodities" (*In re Stewart* (Minn.), 33 L. R. A.), and of which the general public, under reasonable regulations, will have a definite and fixed use, independent of the will of the party in whom title is vested, would be a public use. Mills on Em. Dom., Sec. 11.

A few cases taken from the many, serving to illustrate this statement, will be referred to. Grain

elevators, found so necessary in the handling and shipment of grain, and in its transfer from the producer to the consumer (*Munn* v. *Illinois*, 94 U. S., —; *Brass* v. *N. D.*, 153 U. S., 391); passenger and freight stations (Rand on Em. Dom., Secs. 170, 184; Mills on Em. Dom., Sec. 59); railroad repair shops (*Hannibal & St. J. R. R.* v. *Meder*, 49 Mo., 165; *S. P. R.* v. *Raymond*, 53 Cal., 223); a spur track to a grain elevator and to a stock elevator (*Clark* v. *Blackmore*, 47 N. Y., 150; *Fisher* v. *C. & S. R. R.*, 104 Ill., —); a depot (*Geizey* v. *C. W. & Z. R. Co.*, 4 Ohio St., 308); the extension of telegraph and telephone lines intended for the public service (*Turnpike* v. *American News Co.*, 43 N. J. L., 381; *Pierce* v. *Drew*, 136 Mass., 75; *N. O. & C. R. R.* v. *S. & A. Tel. Co.*, 53 Ala., 211; *Mobile & O. R. R.* v. *P. Tel.*, etc., *Co.*, 17 Pick., 62, S. C., 46 S. W. R., 571), have been held the subjects of public use.

Upon the authority of these cases, and many others of a similar character which might be referred to, we have no doubt the trial Judge was right in holding the enterprise in question was impressed with a public use, unless it be, as is insisted by plaintiff in error, our own cases have laid down a different rule, which, under the doctrine of *stare decisis*, we should adhere to.

We will now examine the cases relied on to sustain this assignment of error. The first of these is that of *Harding* v. *Goodlett*, 3 Yer., 40, in which it

was sought to condemn land for the erection of a grist mill, a sawmill, and a paper mill. In disposing of the case, this Court said that, under the cover of a statute which made a grist mill a public mill, the property of a private citizen could not be taken, against his will, for a joint undertaking, when two of its parts, to wit, the sawmill and paper mill, were purely individual enterprises, with which the public had no concern. This was the extent of the holding in that case.

In *Clack* v. *White*, 2 Swan, 540, the Court simply held Ch. 60· of the Acts of 1811, which conferred upon the County · Court the power to grant a private road, where the lands of one person were surrounded by the lands of another, was unconstitutional and void, in that it sought to take the property of one citizen and apply it to the private advantage of another citizen.

It is clear to us that these cases give no support to the contention of plaintiff in error, but only announce the uniformly accepted principle that in the face of this constitutional provision one man's property cannot be taken under the forms of law and given · to another.

The case, however, most relied on as establishing a rule peculiar to this State is that of the *Memphis Freight Co.* v. *Memphis*, 4 Cold., 419. The Act incorporating the Memphis Freight Company is found in §§ 13, 14, and 16 of Chapter 79 of the Acts of 1865-66. By Section 16 it was

provided "that said corporation is hereby given the privileges of loading and unloading freights . . . on or from steamboats and other water craft that may touch at the port of Memphis, Tennessee, and, for the purpose of carrying on said business, said corporation is granted the right . . . to erect upon the summit of the east bank of the Mississippi river, in the city of Memphis, and between Poplar street and Beal street, such sheds, railroad tracks, . . . as may be necessary for the business of handling freights. Said corporation shall also have the right to lay down such railroad tracks, from their sheds above referred to, to the margin of the Mississippi River, upon which to operate their cars."

We think a cursory reading of this section defining the purpose of the corporation and fixing the limits of its powers is sufficient to characterize this enterprise as exclusively private, lacking all color or pretense of public utility. The Legislature evidently so regarded it, for it conferred no power of condemnation in its charter. This power was claimed by the company under § 1325 of the Code of 1858 (§ 1844, Shannon's Code), which provides that "any person or corporation authorized by law to construct any railroad . . . may take real estate," etc.

The railway tracks which the company was empowered to construct were the mere incidents of its business of handling and warehousing steamboat or barge freight. They were only to serve the con-

venience of the company. In them the public would not have a shadow of interest, over them not a pound of freight could be moved or one individual pass, save with the consent of the corporation or at its instance. The insistence, therefore, in that case that the authority to lay down such tracks entitled the corporation to the benefit of a statutory provision which was passed to encourage the development of a great internal improvement system in this State, including commercial railroads, was to make a mockery of the legislative intent. Hence it is not remarkable that this Court, finding the enterprise a private one, of extremely limited extent, rejected this claim as unwarranted either by public policy or any sound rule of statutory construction.

But that case established no new or unique rule in this State as is now argued. While this is true, we entirely agree with the counsel for plaintiff in error that the fact that an enterprise will result in some convenience to the public— conferring incidental benefits upon the public by affording additional facilities for trade or manufacture—will not make the character of the use public. To this extent the argument of the opinion supports their contention, but no further. We agree the proposed improvement must go beyond that. It must in some way enlarge the resources, increase the industrial energies, promote the productive power of, or afford increased facilities for, the rapid exchange of thought or trade, or otherwise answer the growing needs of the com-

munity as such, before the use becomes public, and the agency controlling passes under governmental control. This proposition is in no way antagonized by that opinion.

After a careful examination of these authorities, we fail to find in them any principle settled or rule announced that constrains this Court to place itself out of line with the well considered cases coming from Courts of great eminence, some of which have been referred to.

On the other hand, we think the case of the *N. & C. R. R.* v. *Cowardin*, 11 Hum., 348, furnished strong support to the judgment of the Court below. By its charter there was conferred expressly upon the Nashville & Chattanooga Railway power to appropriate, by process of condemnation, the lands of private owners for a roadbed or right of way. In that case an effort was made to condemn land for a depot, and the owner resisted upon the ground that the right of eminent domain was, by its charter, confined to roadway purposes, and that lands for a depot could be secured in no other way than by purchase. This was held to be unsound. In disposing of the contention, this Court said, to effectuate the purpose contemplated by its charter—that is, "the transportation or conveyance of persons, goods, merchandise, and produce over" the road, there must be a place of receiving and delivering the freight carried, or to be carried, over it, and that land upon which to establish this place was as

essential as the bed of the road, and, in fact, constituted a part of the road. It was therefore held entitled to condemn land sufficient for a depot.

If it be true, then, that a depot erected by the Nashville & Chattanooga Road was a public use, why should a union depot, laid out and constructed for the accommodation of all the roads now concentrated at Nashville, where, for greater convenience, all travel and freight will be gathered, and to be used by these roads for no other purpose than this railroad would use its own depot, be any the less a public use? The rapid growth of population, the yearly increase in volume and value of commercial interests, the pressing necessity for the speedy handling, delivery, and transmission of freight to prevent accumulations and often ruinous delays, the vast economy of time and money to shippers and the traveling community in the matter of transfers, are among the considerations which have multiplied these depots in cities where railroads centralize, and we are satisfied no improvement in railway intercommunication more nearly touches the public than this. *Fort Street Union Depot Co.* v. *Morton,* 83 Mich., 265.

But it is said this is a private enterprise, because the Act on which the charter rests fixes no rates to be charged by the corporation for the use of its tracks, etc. This is immaterial. The corporation and its property being affected by a public use will be under governmental control, and the Legislature may

at any time fix rates and make more specific the duties clearly implied from the Act of incorporation. *Munn* v. *Illinois*, 94 U. S., 113; *Budd* v. *New York*, 143 U. S., 517. *Brass* v. *North Dakota*, 153 U. S., 391.

Again, it is argued that this is essentially a private undertaking, because the Act shows that it is set on foot for profit to the corporators. This also is immaterial. The authorities concur in holding that an enterprise organized to meet a public demand is not reduced in its character because the parties instituting it have primarily in view private profit. Notwithstanding this it is still impressed with a public use. Mills on Em. Dom., Sec. 13; Rand on Em. Dom., Sec. 54; Lewis on Em. Dom., Sec. 75.

It follows that the assignments of error to the action of the trial Judge in holding this to be a public use must be overruled.

2. We will now consider the constitutional objections urged to this Act.

It is insisted, in the first place, it is unconstitutional because it provides that a terminal corporation may keep at its passenger station a hotel or restaurant, or both, and also a news stand, thus converting the use which might otherwise be a public use into a private use. This objection is not well taken. By its terms the corporation is organized for terminal purposes only. The power of acquiring real estate by purchase or by condemnation is confined to these purposes. Among these, neither

expressly nor by implication, is included that of keeping a hotel, restaurant or news stand. It is only where such a corporation has acquired property to serve the objects of its creation that, in the construction of its passenger station, if it deems best, it may exercise the purely incidental right to provide these accommodations for the public. This neither renders the Act unconstitutional nor converts the undertaking into a mere private enterprise.

It is next insisted the Act in question is obnoxious to that part of Section 17 of Article 2 of the Constitution, which provides: "No bill shall become a law which embraces more than one subject, that subject to be expressed in the title." This clause appears for the first time in the Constitution of 1870, and in 1872 it underwent a critical examination in *Cannon* v. *Mathes*, 8 Heis., 504. In the opinion in that case an extensive quotation is made from Judge Cooley's work on Constitutional Limitations, and there was expressed entire concurrence with the views of the author. This quotation is as follows: "The general purpose of these provisions is accomplished when a law has but one general object, which is fairly indicated by its title. To require every end and means necessary or convenient for the accomplishment of this general object to be provided for by a separate Act relating to that alone would not only be unreasonable, but would actually render legislation impossible . . . The generality of a title is no objection to it so long as it is not

Ryan *v.* Terminal Co.

made a cover to legislation incongruous in itself, and which, by no fair intendment, can be considered as having a necessary or proper connection." This rule was applied in determining the validity of the Act, the subject of attack in that case. That was an Act to raise revenue for the State and was entitled "An Act to fix the State tax on property," but, by one of its provisions, increased largely the tax on privileges. The constitutional attack was made in regard to this last provision as being outside and beyond the title. But on the authority of Judge Cooley's text it was held that there was no incongruity in this legislation, and it was announced "that the true rule of construction as fully established by the authorities is, that any provision of the Act directly or indirectly relating to the subject expressed in the title and having a natural connection therewith, and not foreign thereto, should be held to be embraced in it." This case has since been frequently cited and approved by this Court. *Luehrman* v. *Taxing District*, 2 Lea, 426; *Merrill* v. *Fickle*, 3 Lea, 79; *Frazier* v. *Railroad*, 4 Pick., 156; *Ex parte Griffin*, 4 Pick., 550; *Cole Manufacturing Co.* v. *Falls*, 6 Pick., 469; *State* v. *Yardley*, 11 Pick., 554.

Measured by this rule, does the caption or title of this Act cover incongruous legislation? This caption is as follows: "An Act to amend an Act entitled an Act to provide for the organization of rail-

road terminal corporations, and to define the powers, duties, and liabilities thereof.''

The provisions in the Act which it is urged violate the clause of the Constitution in question are found in the third section, and are those which empower railroad companies, which enter into contracts with a terminal company, to guarantee the principal and interest of bonds issued by such company, as well as other contracts made by it in regard to its corporate business, and also to subscribe for, hold, and dispose of the capital stock or bonds which may be issued by the terminal corporation.

The title gives clear notice to the Legislature and the public that the object of the Act is to provide for the organization of railroad terminal corporations, which shall be clothed with powers necessary to effectuate the purpose of their creation. There could be no mistake, even at a glance, that a company so organized was designed to, and, from the nature of the case, must, be identified with the operation of railroads having terminal points at the place where such corporation is instituted. Without this a terminal company would have no excuse for existence, and, if organized, would serve only as a monument to the folly of its corporators. As might be anticipated, from the reading of the title, the body of the Act manifests the intimate relation which was contemplated between these terminal companies and such railroads.

The plan thus devised for the increased accom-

modation of the public could not, as might well be
assumed, be accomplished without the raising and
expenditure of large sums of money.   The Legisla-
ture recognized this and therefore authorized the com-
pany which organized under the Act to borrow money
as its necessities required, and to that end to issue
its bonds secured by mortgage on its property.   But
realizing, even when so secured, these bonds might
not find ready sale, and desiring, in view of the
possible magnitude and the certain importance of the
enterprise, to give the highest credit to these cor-
porate securities in the money markets of the world,
the Act empowered the railroads interested in it to
add the weight of their guaranty to them, and also
to give aid by subscribing to and holding shares of
its capital stock and bonds.

What was more natural than such a corporation,
created to give increased facilities to these railroads,
should look to them for aid in such an undertaking
and that these roads should be willing to furnish
this aid.   It was in view of this condition of mu-
tual interest and interdependence these provisions were
embodied in the Act.

In support of their contention the learned counsel
for plaintiff in error have pressed upon us a num-
ber of cases, including *Ragio* v. *State*, 2 Pick., 272,
and *Bank* v. *Divine Grocery Co.*, 13 Pick., 603.
All of these cases have been carefully examined and
we are unable to find in them anything to shake
our confidence in the conclusion we have reached.

18 P—9

Ryan *v.* Terminal Co.

Each one has features peculiar to itself that were controlling in its determination. No one of them, adopting the language used in *Frazier* v. *Railway Co.*, "contain any rule or principle for the construction of the constitutional clause in question in any way antagonistic to the well settled doctrine heretofore frequently announced by this Court."

In addition to what was said in the Frazier case may well be repeated here, "The subjects of legislation are infinite. The determination as to whether the several provisions of an Act are congruous and germane becomes largely a question of fact. Particular decisions cannot often be controlling in determination of subsequent cases arising out of this constitutional provision." As each case is presented the Courts are bound to examine the Act in question as a whole, and applying to it the sound rule of construction announced in *Cannon* v. *Mathes*, *supra*, and their "own knowledge of affairs" (*Frazier* v. *Railway Co.*, *supra*) determine whether its provisions are congruous or not.

After a careful review of the case at bar, we are satisfied with the conclusion reached in the Court below. The judgment is therefore affirmed.