STATE *ex rel.* THOMPSON *v.* CITY OF MEMPHIS *et al.**

(*Nashville.* December Term, 1922.)

MUNICIPAL CORPORATIONS. Payment for group insurance for employees of water department held not illegal appropriation of funds.
The action of a city in taking out group insurance for employees in its water department, paying therefor with funds of the water department, *held* not illegal, under Const. art. 1, sections 8, 21, art. 2, sections 24, 28, and article 11, section 8, as an appropriation of public funds for a private purpose.

Acts cited and construed: Acts 1879, ch. 11; Acts 1899, ch. 32.

Cases cited and approved: Scott v. Nashville Bridge Co., 143 Tenn., 86; Bowers v. City of Albuquerque, 27 N. M., 291; Matter of Mahon, 171 N. Y., 263; People of New York, etc., v. Dibble, 231 N. Y., 593; Todtenhausen v. Knox County, 132 Tenn. 172.

Cases cited and distinguished: State ex rel. Haberlan v. Love et al., 89 Neb., 149; Commonwealth v. Walton, 182 Pa., 373; Nichol v. Nashville, 28 Tenn., 252; East Tennessee University v. Knoxville. 65 Tenn., 166; Ryan v. Terminal Co., 102 Tenn., 111; Nohl v. Board of Education of Albuquerque, 27 N. M., 232.

Code cited and construed: Secs. 3450 to 3454 (Tenn.).

Constitution cited and construed: Art. 1, secs. 8, 21; Art. 2, secs. 24, 18; Art. 11, sec. 8.

FROM SHELBY.

Appeal from the Chancery Court of Shelby County.—
HON. F. H. HEISKELL, Judge.

*The right to use public funds to carry insurance for public officers or employees is discussed in note in 16 A. L. R., 1089.

S. O. BATES, District Attorney-General, and F. M. THOMPSON, Attorney-General, for the State.

WILSON, GATES & ARMSTRONG, BURCH, MINOR & McKAY and W. P. ARMSTRONG, for appellees.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

This cause was heard upon the following agreement, to wit:

"This is an agreed case filed in the chancery court of Shelby county, Tenn., under and pursuant to sections 3450 to 3454 (both inclusive) of the Code of Tennessee.

"It is agreed by the parties hereto, as follows:

"Frank M. Thompson is the attorney-general of the State of Tennessee, and is charged generally with the enforcement of the laws of the State and the prosecution and prevention of violations of the laws of the State. His personal residence is in the county of Hamilton and his official residence is in the city of Nashville, county of Davidson.

"Samuel O. Bates is the district attorney-general for Shelby county, and his personal and official residence is in the city of Memphis, Shelby county, Tenn.

"Will A. Hall is a citizen and resident of the city of Memphis, Shelby county, Tenn., and is a regular purchaser and consumer of water furnished by the city of Memphis to residents of the city, and said Will A. Hall pays regularly each month for water so furnished to him by the city of Memphis.

"This suit is brought by the State of Tennessee on relation of said Frank M. Thompson, attorney-general, and on relation of said Samuel O. Bates, district attorney-general,

and on relation of said Will A. Hall as a resident taxpayer
of Memphis, Tenn., and a regular purchaser of water from
the city of Memphis, and also by said Will A. Hall in his
own personal capacity as a citizen and resident of Mem-
phis, Tenn., and. a regular purchaser of water in the city
of Memphis, Tenn.—suing for the benefit of himself and
all other taxpayers of the city of Memphis and purchasers
of water from the city of Memphis.

"The defendants to this suit are the city of Memphis, a
municipal corporation, created by châpter 11 of the Acts
of 1879 and organized and existing in pursuance of said
act and the acts amendatory thereof; F. G. Proutt, T.
F. Stratton, and Milton J. Anderson, composing the board
of water commissioners of the city of Memphis, F. G.
Proutt being the chairman of said board, said three par-
ties last mentioned having been duly appointed members
of said board by the board of commissioners of the city of
Memphis.

"The city of Memphis is the owner of a large and exten-
sive waterworks and water supply system, having acquired
said system by virtue of authority conferred by chapter
32 of the Acts of 1899, and owning said waterworks and
water supply system in fee simple.   The city employs a
large number of persons in said water department.   The
water department of the city furnishes water to all resi-
dents of the city who desire to purchase water from the
city, whether for domestic, manufacturing, or other pur-
poses, and the water department also furnishes a large
quantity of water for the fire, street, police, and other de-
partments of the city of Memphis.   Some residents of the
city, however, have sunk their own artesian wells on their

own property and do not purchase water from the city water department but use water from their own water supply.

"The Equitable Life Assurance Society is a mutual life insurance company incorporated and organized under the laws of the State of New York, and licensed and authorized to transact business in Tennessee, and having an office and a general agent in Memphis, Tenn.

"Bank of Commerce & Trust Company is a banking corporation and trust company organized under the laws of the State of Tennessee with its place of business in Memphis, Tenn.

"Defendant Minnie Wilton is the widow of John Wilton, deceased, and defendant Emeline L. Allen and Minnie A. Born are daughters of said John Wilton, deceased, and said defendants are the beneficiaries, in equal shares, survivors or survivor, under the certificate of insurance issued by the Equitable Life Assurance Society to the said John Wilton, hereinafter mentioned, and are the parties now claiming the right to recover the proceeds of said insurance, arising from the death of said John Wilton, as hereinafter set forth; all are residents of Shelby county, Tenn.

"Group insurance is a modern development in the life insurance field. It may be carried by any employer who has regularly in his employ fifty employees or more. It may cover all of the employees of the employer or all employees of any one or more classes in his employ. It applies to all employees, without regard to age, sex, race, or occupation. It is purchased cheaper *per capita* than the individual employees can purchase individual insurance. No medical examination of employees covered is required.

Experience shows that twenty per cent. of the average run of employees cannot obtain life insurance at standard rates because of physical defects. In case of death the benefits are payable to the employee's beneficiaries, named by him, as in other insurance. In case of total disability, the benefits are payable to the employee. The benefits increase annually, according to the length of service of the individual employee, until the benefits, in this case, reach $2,000 in the sixth year as to office help and heads of departments and $1,000 in the sixth year as to laborers. The insurer furnishes health bulletins and consultant advice on matters pertaining to health and general welfare of employees and likewise makes surveys of plants, checks up safety appliances, gives consultant advise on matters pertaining to employment problems, and renders other assistance in matters pertaining to the efficiency of employees, reduction in labor turnover, and similar problems.

"During the latter part of the year 1920, the board of water commissioners of the city of Memphis took under consideration the carrying of group insurance on the lives of certain of its employees, and, after careful investigation of the matter, by resolutions duly passed on December 29, 1920, and January 5, 1921, contracted with the Equitable Life Assurance Society for the carrying of group insurance on the lives of certain of its employees. Copies of said resolution are hereto attached and made a part hereof as Exhibits 1 and 2.

"Thereupon the Equitable Life Assurance Society issued a policy covering the employees of the water department who are to be insured, and a copy of said policy is hereto attached as Exhibit 3, and made part hereof; said policy became effective January 1, 1921.

State ex rel. v. City of Memphis.

"In addition to the policy just referred to, there was issued to each employee embraced in said group insurance, a certificate showing his interest in said group insurance. A copy of the certificate issued to John Wilton, an old and valued employee of the water department, is hereto attached as Exhibit 4 and made part hereof. Said certificate is typical of certificates issued to other employees. The number of employees covered by said group insurance is one hundred and one. The water department paid in advance to said insurance society an estimated premium of $1,771.55 for the first year's insurance under said policy (and later $72.40, being the balance of said premium). covering the calendar year 1921, and has also paid a second estimated premium in advance, $1,923.96, covering the calendar year 1922. The water commissioners were induced to incur the expense of the group insurance just referred to for the following reasons: The water commissioners believed that, in order to retain skilled employees in its service, and in order at all times to be able to furnish water in any quantity to the residents of the city, it was necessary to give its employees some consideration in addition to the regular wages and salaries of such employees; it is customary for banks, manufacturing corporations, and other large corporations in the city of Memphis to carry group insurance for the benefit of employees, and the water commissioners believe that, unless the water department could likewise take care of its employees, such employees would not remain long in its service, but would go into the service of others, where they felt that their families and dependents would be taken care of, to some extent, in the event of death of such employees, and they

themselves would be provided for in the event they should become disabled.

"The water commissioners also found that, by carrying group insurance, the employees of the water department remained in the service of the water department and did not leave to go into the employ of others, and were satisfied; and they further found that better and more satisfactory service was rendered by employees when group insurance was carried than when no insurance was carried. The water commissioners, in contracting for said group insurance, were influenced solely by a desire to give the best possible service to the public, and to be at all times able and ready to furnish that most vital necessity to all communities, to wit, an unlimited supply of pure wholesome water.

"While the compensation of all employees of the water department embraced in said group insurance is for a specific amount of money, yet said insurance is treated and understood by the employees of the water department and by the board of water commissioners as part of the compensation of said employees.

"All the expenses of the water department are borne by receipts obtained from the sale of water, and the rates at which water is sold are fixed at such amounts as will yield sufficient revenue to pay all operating expenses of the water department, all repairs of said waterworks system, and to pay all fixed charges and interest on outstanding bonds, and to provide a sinking fund for the payment of such bonds.

"The amount paid annually for group insurance by said water department increases to that extent the operating expenses of said water department and said additional ex-

pense is borne and met by such addition to water rates as may be necessary to pay said additional insurance expense.

"The said Will A. Hall and all other water consumers of the city of Memphis, of whom there are many thousand, are interested in the operating expenses of the water department, and any addition to operating expenses adds an additional burden to all water consumers for the purchase of water from the city of Memphis. During the calendar year 1921, the total operating expenses of the water department amounted to $355,918.32.

"At the time of the contracting for said insurance, both the city of Memphis (including its board of water commissioners) and the Equitable Life Assurance Society, were of the opinion that said contract of insurance was valid and that said contract as made was within the powers of said water commissioners of the city of Memphis.

"During the year 1921, the attorney-general of Tennessee rendered an opinion to the insurance commissioner of the State of Tennessee, in which the attorney-general reached the conclusion that the carrying of group insurance by a municipal corporation for the benefit of the employees of such corporation was *ultra vires* and beyond the powers of a municipal corporation in Tennessee, and amounted to an unlawful diversion of public funds to private uses, and complainants herein are of the same opinion and make the same contention in this cause. The city of Memphis and its water commissioners and the Equitable Life Assurance Society are nevertheless still of the opinion that said contract of insurance is legal and entirely within the lawful powers of the board of water commissioners, but at the same time said parties do not desire to vi-

‘olate the law, but, on the other hand, to strictly obey the law, and therefore, in pursuance of a trust agreement, copy of which is hereto attached and made Exhibit 5, there has been paid into the hands of the Bank of Commerce & Trust Company, trustee, a total of $6,055.57, composed of the items set out below, and said account as it appears upon the books of said trustee is as follows:

1922

March 2. Ck. from Memphis Artesian Water Dept. balance due Equitable Life Assurance Society for group insurance for year 1921, $72.40, and estimated premium for year 1922, $1,923.96 .......... $1,996 36

March 23. Ck. from Memphis Artesian Water Dept., being check of Equitable Life Assurance Society, for return of unearned premium received from Water Dept. ........ 1,771 55

March 25. Ck. from Equitable Life Assurance Society covering death benefit accruing to beneficiaries of John Wilton 2,000 00

April 18. Ck. from Equitable Life Assurance Society, for dividend due Jan. 1, 1922, on policy No. 5910937 ....... 287 66

June 6. Balance cash on hand .....$6,055 57

$6,055 57 $6,055 57

"Other payments will probably be made to said trustee under the terms of said trust agreement.

"The beneficiaries of John Wilton, to-wit, Minnie Wilton, Emeline L. Allen, and Minnie A. Born, are the widow and daughters respectively of said John Wilton above mentioned, and are parties hereto, and as such beneficiaries are claiming the $2,000 above mentioned as accruing to them under the policy of insurance herein involved.

"The said Bank of Commerce & Trust Company as trustee, holds the funds above mentioned, and such other funds as may be paid to it under said trust agreement, and will dispose of said funds in accordance with the determination of this case, when so advised by said city of Memphis and said Equitable Life Assurance Society.

"This is a real and substantial controversy and not a moot question, and the parties hereto are vitally interested in its determination, and, in addition, it may be added that the question is one of interest to all other municipalities in the State of Tennessee, several of which are carrying similar group insurance for the benefit of city employees.

"Upon the above statement of facts the parties hereto submit to the court for determination the question as to whether the city of Memphis, acting through its said water commissioners, can lawfully contract and pay for group insurance upon its employees, as above stated, or whether such action on the part of said water commissioners is *ultra vires* and amounts to an unlawful diversion of public moneys to private uses.

"In the event the court should decree that said contract of insurance is an *ultra vires* act on the part of said water commissioners, then the parties complainant herein ask that the court decree that the city of Memphis and the board of water commissioners of the city of Memphis be

enjoined from further carrying out said contract of insurance, and that the said contract of insurance be declared void *ab initio,* and that the Bank of Commerce & Trust Company, as trustee, pay to the city the premiums of insurance now in its custody, as said trustee, and that said Bank of Commerce & Trust Company pay to the Equitable Life Assurance Society any sums paid by the Equitable Life Assurance Society to said trustee by reason of the death or injury of any employee covered by said insurance.

"On the other hand, in the event the court holds that the contract of insurance above referred to is legal and within the powers of the city, then the court is asked to decree that said Bank of Commerce & Trust Company, as trustee, pay to the Equitable Life Assurance Society the insurance premiums in its possession under said trust agreement, and pay to the beneficiaries or to the water department of the city of Memphis for the benefit of the beneficiaries entitled thereto any amounts paid by said assurance society to said trustees on account of the death or injury to any of the employees, covered by said insurance.

"Signed at Memphis, Tenn., this 25th day of May, A. D. 1922."

The certificate issued by the insurance company for each employee, and delivered by the water company to each employee, contains the following recital:

"To Employees of the Memphis Artesian Water Department:

"This certificate of insurance comes to you without charge, and in the event of your death while in the employ of this department, your beneficiary will be paid the

amount of this certificate plus such additional amount for each year of service as is indicated on the table printed on the opposite page.

"Recognizing our mutuality of interests, we hope many may obtain through this insurance, a provision for those dear to them, which might otherwise be expensive or perhaps in some cases impossible.

"Yours very truly,

"MEMBERS ARTESIAN WATER DEPARTMENT,

"By SANFORD MORISON, Secretary."

Upon an employee leaving the service of the water department, the insurance as to him terminates, but he may, without examination as to condition of health, moral standing, etc., procure insurance of a like amount by paying the extra premium provided therefor to the insurance company, and thus continue the insurance independently of the city.

For the complainants it is contended that the city was without power and authority to appropriate funds received from the sale of water to pay premiums on said policies of insurance, and they rely upon the following provisions of the Constitution of Tennessee, to-wit: Article 1, section 21, article 2, section 28, article 2, section 24, article 1, section 8, and article 11, section 8.

Without copying the foregoing sections of the Constitution into this opinion, it might be said that, in relying upon all of said provisions, the complainants make the one point that the application of said funds by the water department to the payment of said premiums of insurance is an appropriation of public funds for a private purpose.

Since it is conceded by counsel for the defendants that the operation of said water plant is a public function, and that the money received for water is a public fund, it will

not be necessary to discuss our cases bearing upon this question.

It is contended by the complainants that this action of the city cannot be sustained under the police power provision of the Constitution, it being contended that the issuance of said policy and the payment of the premium therefor has no relation, either directly or indirectly, to the improvement of the public health, the public morals, or the general welfare of either the State or the City of Memphis.

Upon the other hand, it is insisted by the defendants that by this comparatively small appropriation the city is better enabled to retain skilled employees in its service, and is thereby better capacitated to furnish the inhabitants of the city at all times with an adequate supply of pure wholesome water.

While some criticism is made as to the interpretation of certain provisions of the stipulation relative to the beneficial results experienced by the city as a result of investing in said group insurance, we are of the opinion that, taking the agreement as a whole, it must be at least assumed that, in the judgment of the commissioners, better and more efficient service has resulted on the part of the employees, and that they are better satisfied and are more likely to remain in the employ of the city. The right to fix the wages of employees inheres in the city, and when, in its judgment, conditions justify an increase in wages, it has the power to authorize such increase. The act under which the water department functions authorizes the city to fix the compensation of its employees.

In 28 Cyc. 601, it is said: "Unless such change is prohibited by the Constitution, statutes, or charter provisions,

the power vested in a municipal board or officer to fix the compensation of a municipal agent or employee generally includes the power to increase or reduce, the salary or wages of such agents or employees."

It could hardly be contended but that the governing powers would have the right to increase the annual wages of each employee of the water department $18 per annum, if justified by existing conditions. This, in effect, is what it did when it took out said policy of group insurance, but from an economic basis, it concluded that better results would be obtained as to both parties by investing it in insurance instead of paying the money to the employee. Ordinarily what can be done indirectly can be done directly. If a city can increase the wages of its employees, why not invest the increase in insurance for them instead of paying it to them direct, if, by so doing, they are better satisfied and the city obtains better service.

The large enterprises of this country have reached a wonderful condition of economic efficiency, and, according to the stipulation, they are adopting the group insurance system for the benefit of their employees. If it is beneficial to them, why would it not be beneficial to our municipalities? While we are not concerned with the policy of the governing authorities of our municipalities, the foregoing observation meets the argument that if this action is sustained all other municipalities will adopt this policy. To this there can be no objection if, as an economic measure, it is to the best interest of the municipalities to adopt it. There is no law requiring municipalities to provide its employees wth such insurance, and it will not be presumed that they will do so unless they receive a benefit therefrom, and should it fail to produce the anticipated results it can

be discontinued at any time. Certainly such an investment is of benefit to the wage earner. Ordinarily the wages of such an employee are insufficient to enable him to adequately provide for his family after death. In this case the family of John Wilton, a valued employee of the city, will receive $2,000, which may prove a very present help in time of need. This system may not only provide better service and more wholesome water, but it may relieve the city and county of the expense of caring for dependent families of deceased employees.

Upon the principle here involved—that is, of better and continued service, and more wholesome water—various courts have sustained statutes requiring cities to pension firemen and policemen. Such an act was sustained in *State ex rel. Haberlan* v. *Love et al.,* 89 Neb., 149, 131 N. W., 196, 34 L. R. A. (N. S.), 607, Ann. Cas., 1912C, 544, the court saying:

"A fireman's pension may be classified as part of his compensation for services rendered, or it may be said that it is paid to him for the purpose of stimulating all those engaged in a like public duty to prevent and suppress the destruction of property and the loss of human life incident to those conflagrations which the utmost vigilance may minimize, but cannot entirely prevent, in populous cities. Within whichever class the pension may fall, public funds may be appropriated in conformity with legislative authority to pay the fireman, and the money is thereby expended for a public purpose."

Further on in the opinion the court said:

"In applying these limitations to the instant case, it may be conceded that the pension forms an inducement

to the individual to enter and remain in the service of the fire department, and that the pension in a sense is part of the compensation paid for those services."

McQuillan, in his work on Municipal Corporations, section 2169, says:

"On the other hand, municipal appropriations to a fireman's relief association have been held proper, and a municipality may appropriate money to a corporation to create a fund to pension police officers, since this is a strictly municipal use. So a municipality may pension policemen, where injured, or after a certain period of service. So aid to a college, and appropriations for incorporated homes for friendless women, or for industrial expositions, or to secure the location near the city of a state reform school to which it may send its youthful offenders, have been held proper. Sending the Liberty Bell to an exposition has been held a proper expenditure, as has the repaying property owners for pipe laid with the understanding that the municipality would refund the costs."

In *Commonwealth* v. *Walton,* 182 Pa., 373, 38 Atl., 790, 61 Am. St. Rep., 712, the court said:

"A judiciously administered pension fund is doubtless a potent agency in securing and retaining the services of the most faithful and efficient class of men connected with that arm of the municipal service in which every property owner and resident of the city is most vitally interested. Reasons in support of this proposition need not be stated in detail. They are such as readily suggest themselves to every reflecting mind."

The constitutionality of mother's pension acts have generally been sustained by the courts upon the ground that they prevent dependency and destitution.

147 Tenn.—43

The policy in question provided insurance for the widows and children of deceased employees, and prevents dependency and destitution, and to this extent is related to the mother's pension acts.

In a sense the Workmen's Compensation Act (Pub. Laws, chapter 123) which was sustained by this court in *Scott* v. *Nashville Bridge Co.*, 143 Tenn., 86, 223 S. W., 844, is analogous, for it recognizes the right of a municipality to carry insurance upon the lives of its employees.

In holding that the city of Nashville could lawfully subscribe to stock in the Nashville & Chattanooga Railroad, this court, in *Nichol* v. *Nashville*, 9 Humph, 252, said:

"What is a corporation purpose of the town of Nashville? General definitions are always difficult to be given with precision and accuracy, especially where they have to cover as extensive ground as that embraced by the expression, corporation purposes. I shall not, therefore, attempt to specify what are corporation purposes of the city of Nashville. They are or may be made to be as numerous and diversified, as may be found requisite by experience, to promote the peace, health, comfort, and prosperity of its corporators, and anything which promotes these things, is or may be constituted a legitimate corporate purpose. Perhaps I might divide corporate purposes into two classes: those which are direct, and those which are indirect. A direct corporate purpose might be styled to be one, which in its direct and immediate consequences, operates upon the interests of the corporation. Such would be all police regulations for the government of the town, the promotion of good order, the protection of its citizens from the lawless, the suppression of vice, the opening and preservation of highways, streets, and alleys,

the erection of market houses and hospitals, supplying the town with water, etc.  An indirect corporate purpose might be styled to be one which does not, in its direct and immediate consequences, operate upon the corporators, but the beneficial effects of which are to be experienced in a remoter degree, and which have to be traced to their source before they can be duly comprehended and appreciated."

And later on in the opinion, in discussing the construction to be given the power vested in the city, the court said:

"But this strict construction has never confined the execution of the power to its word and letter, but everything necessary and proper for carrying into execution the granted power has always been conceded by the strictest constructionist."

In *East Tennessee University* v. *Knoxville*, 6 Baxt., 166, this court said:

"The principle that governs, in determining whether an appropriation is for a corporation purpose or not, may be clearly illustrated by reference to what corporations may do in the preservation of health of its inhabitants. The preservation of health is universally conceded to be a legitimate corporation purpose.  To carry out the power to preserve the health of a city, money may be appropriated to secure a constant supply of wholesome water; hence, waterworks outside of the city, from which good water may be conveyed into the city, may be erected and operated either in whole by the city or in connection with others.  In like manner, it is now well understood, that public parks in the vicinities of cities, contribute essentially to the health and comfort of its inhabitants, and hence money may be legitimately appropriated for these purposes.  So, like-

wise, as to the erection of hospitals and pest houses outside of a city."

In *Ryan* v. *Terminal Company*, 102 Tenn., 111, 50 S. W., 744, 45 L. R. A., 303, the court said:.

"The term 'public use' is a flexible one. It varies and expands with the growing needs of a more complex social order. Many improvements, universally recognized as impressed with a public use, were nonexistent a few years ago."

The foregoing excerpts from the decisions of this court (and many others could be cited to the same effect) indicate that this court has followed a liberal and progressive policy in dealing with this question, and has refused to interfere with the discretion of the governing powers of the municipality in such matters, except where there has been an abuse of discretion.

The exact question here involved has been passed upon by only one state court of last resort so far as we are aware. In *Nohl* v. *Board of Education of Albuquerque*, 27 N. M., 232, 199 Pac., 373, 16 A. L. R., 1085, there was involved the validity of a contract of group insurance upon the lives of teachers in the public schools of Albuquerque. The court sustained the right to insure and said:

"The expenditure of public funds raised by taxation or other methods for public purposes must necessarily be intrusted by the legislature to public agencies, and these agencies are required to exercise discretion and judgment in determining the purpose for which such money will be spent, within the limits of the authority granted, and courts will not interfere, unless there is a clear departure from the legislative authority. In the management and conduct of public schools of the State the school authorities are

called upon to determine the objects and purposes for which the school funds shall be expended, within the limits of the authority granted, which will prove beneficial to and promote the interests of education, and to expend money daily for such purposes.

"It is admitted that the securing of group insurance for the teachers enables the board of education to procure a better class of teachers, and prevents frequent changes in the teaching force.  This is certainly desirable and conducive to the 'proper conduct of the public schools.'  School funds are now being spent in all the school districts of the State, and in many, if not all, of the other States, for purposes and objects unquestionably proper, gauged by our advancing civilization, which a quarter of a century ago would have been considered highly improper.  In many of the schools we have mechanical instruction in many of the trades and professions which not so many years ago would not have been tolerated.  The teaching of music, arts, and science has become a recognized necessity.  Many things are provided now for the comfort and convenience of both teachers and pupils which heretofore would have been prohibited by injunction as an improper expenditure of public funds.  In some of the schools of the State gymnasiums, swimming pools, playgrounds, and other forms of recreation, amusement, and diversion are provided, because it is recognized by advanced public sentiment that such instrumentalities are calculated to and do promote the cause of education, and tend to better the schools and keep the pupils and teachers satisfied and contented.  Many corporations employing large numbers of laborers throughout the country carry group insurance on such employees with the same object in view as that which evidently was

in the minds of the members of the board of education of the city of Albuquerque when the insurance in question was purchased. In many parts of the State we have consolidated schools, where conveyances are hired, or means of transportation provided, by which pupils living at long distances from the school are transported to and from the consolidated school. The power of boards of education to do so has never been questioned, because it is recognized that better schools are thus provided, and the cause of education is promoted.

"It is clear that the courts should not interfere with the discretion intrusted to boards of education under the statute, unless it plainly appears that there has been a gross abuse of such discretion, and that the funds are being spent for purposes and objects which have no relation to the public schools. This cannot be said in this case."

The question was again before the supreme court of New Mexico in the case of *Bowers* v. *City of Albuquerque*, 27 N. M., 291, 200 Pac., 421, involving the carrying of group insurance on employees of the city, and upon the authority of the previous case the court upheld the right.

A similar question was held invalid by a judge of an inferior court in New York, but in the court of appeals his action was not passed upon, the court saying:

"No question is made . . . that relator has not taken proper steps to the enforcement of its claim, assuming that the city had the legal right to contract. . . . The record is . . . too fragmentary to enable the court to decide the fundamental question as to the right of the city to take out the policy which has actually been issued to it and the duty of the city to pay the premium thereon.

"1. It does not appear that the bill of relator has been audited or allowed by the common council nor that the comptroller has been ordered to pay the same, nor that such audit, allowance and order are unnecessary, nor that the comptroller has legal authority to pay the relator. Peremptory mandamus will not lie unless it appears without contradiction that it is the clear legal duty of the comptroller to pay the bill.

"2. The record does not set forth the facts needful to enable the court to determine the question argued. The insurance policy actually issued is not before us. We are left in ignorance as to its terms. It does not appear whether or not the insurance continues to cover the life of an employee after he voluntarily leaves the service of the city. The opinion of BORST, J., at special term refers to disability benefits but so far as the record shows the policy is one of life insurance only. It does not appear that employees disabled before the policy was issued are excluded from its benefits. It does not appear that the insurance is not unauthorized as a donation or as extra compensation (*Matter of Mahon,* 171 N. Y., 263) as to any of the employees of the city. The inadequacy of the record in this and other respects precludes us from examining the question as to the power of the city to take out group life insurance for the benefit of its employees who may thereafter die or become disabled while in the service of the city. The order should therefore be affirmed, with costs. . . . Order affirmed." *People of New York, etc.,* v. *Dibble,* 231 N. Y., 593, 132 N. E., 901.

We are therefore of the opinion that the action of the city in taking out said group insurance was in no sense il-

legal, and that the expenditure of said fund was for a public purpose.

It is contended by the complainants that chapter 32 of the Acts of 1899, under which the water plant of the city of Memphis is operated, is invalid, for the reason that it was enacted for the special benefit of Memphis, and confers rights and privileges upon that city not enjoyed by the other cities of the state.

In *Todtenhausen* v. *Knox County,* 132 Tenn., 172, 177 S. W., 487, it was held otherwise. Independently of this, the city had a right to operate a waterworks system, and to employ laborers, fix their compensation, etc.

This is an important case, and we take this means of expressing our gratitude to the attorney-general and to counsel for the defendants for the able manner in which the case was briefed and argued.

The Chancellor held the action of the city in taking out said policy of insurance valid, and his decree will be affirmed, with costs.