Matthews, J.
These actions come before the court upon demurrers to the petitions which contain substantially identical allegations, mutatis mutandis, that the defendants are willful and habitual violators of the price for dry cleaning garments fixed by the “Code of Fair Competition” promulgated in .accordance with the terms of the act of the Ohio Legislature known as “House Bill No. 705,” passed on July 1st, approved by the Governor on July 12th, and filed with the Secretary of State on July 20th, 1933, to accomplish state cooperation in effectuating the policies of the “National Industrial Recovery Act” passed by Congress and approved *123 by the President, one of the expressly enumerated purposes of which is to foster fair competition.
It is alleged that the defendants charge less than the price fixed by the “Code” and have repeatedly announced in advertisements their intention to persist in charging less than their competitors, contrary to the provision of the “Code” prohibiting such practice.
As a result of this conduct, it is alleged that the entire' dry cleaning industry in the local area has become demoralized, resulting in great loss to other members of the trade who are observing the provisions of the “Code,” thereby impairing their purchasing power and ability to employ help.
The provisions of the “Code of Fair Competition,” which are set forth in the petition, provide for- the appointment of a “Code Authority” of ten persons, with authority to “establish fair and reasonable minimum retail prices by region and/or local areas for the- several services comprised within the definition of cleaning and dyeing,” which prices shall be given through such steps as may be reasonably calculated, to notify all members of the trade thereof”; and also prohibit announcing a policy or continuing practice of the advertiser of generally or regularly underselling competitors or selling at less than the established retail price.
There are allegations that specified minimum prices were established “under the terms of the Code and the conditions thereof,” and that these prices are “fair and reasonable.” While there is no direct statement that the prices were established by the “Code Authority,” that is necessarily implied in the averment that they were established under the terms of the code. As it is the rule that on demurrer a pleading should be liberally construed in favor of the pleader, it will be assumed that the prices were so established.
The defendants are charged with threatening to continue these violations and an injunction to restrain them is sought.
The demurrer admits the truth of all these allegations. The task therefore is to ascertain the law and apply it to the admitted facts.
It should be noted that no claim is made that the acts *124 of the defendants bear any relation to interstate commerce. There is no allegation bringing the transaction within the power of Congress to regulate interstate commerce.
There is nothing pleaded concerning the state of the industry in the local area at the time of the promulgation of the “Code.” There is no averment of the existence of a condition between dyers and cleaners themselves, or in their relation to the public, that required correction by regulation. Nor is there any allegation showing a special or peculiar interest of the public in this particular industry, unless the averments already mentioned that the purchasing power and ability to employ help of the other members of the trade have been impaired by the violation of the “Code” by the defendants, may be so regarded.
The legal sufficiency of these petitions is assailed on the general ground that it is beyond the power of the lawmaking agencies to create such a cause of action under any circumstances, and, also, on the more restricted ground that if the subject is within legislative power under special circumstances, those special circumstances have not been pleaded.
(1st) It is argued that the National Industrial Recovery Act is unconstitutional. It seems to be manifest that that fundamental question is presented only indirectly — if at all —by this case. As it-is not alleged that interstate commerce is affected, the constitutionality of the act as applied to that sphere of national power is not involved. The power of Congress to legislate under the “General Welfare” clause need not be considered, for the reason that that clause is not an independent grant of power to legislate generally, and furthermore, the state, to the extent that it has not been restrained by the Federal Constitution, certainly has such power, which it has attempted to exercise by “House Bill No. 705.”
If “House Bill No. 705” incorporates the terms of the National Recovery Act, or some of them, and thereby makes them a part of the state act aforesaid, then a consideration of the constitutionality of “House Bill No. 705” may bring under consideration some of the provisions of the state law appropriated from the National Industrial Recovery Act. It will be, however, as state law that they will be considered *125 and their validity determined, and not as an Act of Congress.
(2) It is urged that “House Bill No. 705” as applied to the facts pleaded, contravenes the “Due Process” clause of the Ohio Constitution and the Fourteenth Amendment of the Constitution of the United States in that it arbitrarily and unreasonably deprives the defendants of liberty and property, and also contravenes Sec. 1, of Art. II, of the Ohio Constitution, vesting legislative power in the legislature, in that it attempts to delegate the law-making power to an administrative officer, or board.
That there was widespread fear of unrestrained governmental power at the time of the ratification of the United States Constitution cannot be doubted in the light of historical data. This was certainly true of the attitude toward power possessed by a distant government. It produced immediately the first ten amendments limiting the power of the national government. In the fifth amendment we find for the first time in a written constitution the declaration that no person shall be deprived of life, liberty or property without due process of law. It is found now in every state constitution, including that of Ohio. It was undoubtedly appropriated from the English law, where it had been embodied in Magna Charta and other documents, loosely called the English Constitution, as a restraint upon the crown, and as a pledge by the king that he would refrain from those arbitrary orders and exactions which certain kings had visited upon their subjects, and which were regarded as infringements of fundamental rights existing anterior to, and beyond the power of autocratic government. The rule was not directed against the English parliament. It was, in effect, a pledge exacted by the English people from the king. The king was restrained. Parliament representing the people, was unrestrained, and any law passed by it was valid and the enforcement of such law was due process, even though it had the same effect upon the life, liberty or property of the individual as the acts of the king against which he was protected by sanctions of the king himself. Clearly, the prohibition was intended to have a different operation when it was made a part of our constitution. Its effect was broadened. *126 It was directed against not only the executive, but against every department of government. By it the official conduct of every governmental agency — legislative, executive and judicial — toward every person must comply with this test of due process of law.
, It was not until after the Civil War that the power of the state governments was limited by the Fourteenth Amendment to the United States Constitution so that they were restrained from depriving any person of life, liberty and property without due process of law or denying to any person within their jurisdiction the equal protection of the law. The Fourteenth Amendment rendered the states incapable as political entities, acting either through official agencies or by direct act of the people thereof, of withholding due process of law or its equal protection. It has been in cases challenging state action, as violative of the Fourteenth Amendment that' by the process of inclusion and exclusion has the meaning of the phrase been disclosed. Now what do the cases disclose? In the'first place, the cases make manifest that the same test is not applicable to all kinds of governmental action. What would be due process with reference to the exertion of the taxing power is a different thing from due process as applied to judicial procedure, and what would be-due process under the war power would fall far short of due process in times, of peace.
In this case we are concerned with legislative measures of a regulatory nature and their application by administrative officials of the state of Ohio, and our task is therefore to determine the meaning of due process of law and the equal protection of the law as applied to such state action.
Of course, it was not intended by these constitutional guarantees to deprive the state of all power to make laws. “Due process of law” and the “equal protection of the law” presuppose law-making power and its exercise. The words import that there is to be a course or process of law that is just and proper, and to which persons are entitled. In short, the control by government shall be by due process of law, and by the correlative guarantee it shall not be unequal in its operation.
Now, what rights’against government itself have persons as to the kind of laws by which they are to be governed? *127 What are their dues in that respect? To what kind of laws are they entitled? A suggestion at least of the meaning of due process is obtained by the fundamental concept and purpose of governmental agencies. They are the servants —not the masters. Rights existed before government. They are primordial. All men possess certain fundamental rights and to enable them to enjoy them in their relations with their fellowmen governments were instituted. They are limited only by the presence of an equal right in all. It is as the servants assisting persons in the enjoyment of the maximum of their rights of life, liberty and the pursuit of happiness that is found the true function of governmental officials. That is what is rightfully expected of government by all alike. It requires the departments and officials to have in mind the general welfare and to curtail the right of the individual only for the purpose of enlarging the opportunity of enjoying rights by all. When they act in conformity to that purpose the course of government is due process of law. When government perverts its purpose and acts arbitrarily, unreasonably or intolerantly, or in any way for private purposes, such conduct is not due process of law, and the individual whose rights are abridged has constitutional basis for complaint against such action. But when the proper purpose of government — the general welfare — is promoted the individual right must yield, even to the point of extinction.
In Chicago v. Sturges, 222 U. S., 313, it is said:
“Primarily governments exist for the maintenance of the social order. Hence it is that the obligation of the government to protect life, liberty and property against the conduct of the indifferent, the careless, and the evil-minded may be regarded as lying at the very foundation of the social compact. A recognition of this .supreme obligation is found in those exertions of the legislative power which has as an end the preservation of social order and the protection of the welfare of the public and of the individual, if such legislation is reasonably adapted to the end in view, affords a hearing before judgment, and is not forbidden by some other provision of constitutional law, it is not to be regarded as denying due process of law under the provisions of the Fourteenth Amendment.”
By the Constitution of the United States all the power not delegated by it is expressly reserved to the states or *128 the people. By the Ohio Constitution legislative power is conferred upon the legislature with certain express limitations, of which the requirement of due process is one.
When government properly exerts itself in conformity to due process of law it is said to exercise its police power. In Mutual Loan Co. v. Martel, 222 U. S., 225, it is said:
“In a sense the police power is but another name for the power of government,”
and so, if we understand the meaning of the phrase “Police power,” we have a conception of governmental exertion in conformity to due process. Upon the definition of the police power the court in Sligh v. Kirkwood, 237 U. S., 52, said:
“It is not susceptible of circumstantial precision. It extends, as we have said, not only to regulations which promote the public health, morals and safety, but to those which promote the public convenience or the general prosperity. * * * * And further Tt is the most essential of powers, at times the most insistent, and always one of the least limitable of the powers of government.”
This power of making laws is conferred upon the legislature and so long as it pursues the objects enumerated, it has complete power to determine the means and methods. In other words, it determines the policy. The laws and regulations enacted by it must be declared and applied by the courts, unless there is such a manifest departure from the rightful function of government, unless the act is so arbitrary, unreasonable or intolerant, that “he who runs may read.” Every reasonable presumption must be indulged in favor of the constitutionality of the law. The courts under such circumstances are applying the constitutional test to the acts of a co-ordinate branch of the government bound by the same oath to support the constitution.
It is manifest that due process does not dictate specific ends to be obtained by specific means. State enactments to enforce opposite policies have been upheld against the charge of lack of due process.
It is equally manifest that due process does not prevent classification for the purpose of legislation if there is a reasonable basis for it and the law affects all equally standing in like relation to the subject matter.
*129 It would be useless to extend this opinion by citation of authorities showing the exercise of governmental powers. Due process of law permits the sovereign to legislate to affect a single individual by name, (U. S. v. Price, 116 U. S. 43) a class by description, (U. S. v. Realty Co., 163 U. S. 427 at 441) or to embrace the entire population, the only requirement being that there shall be some reasonable basis, and that the law shall operate equally. Nor is there any constitutional requirement that the object of legislation shall relate to all the people. The public interest or welfare doesn’t mean that. Indeed a large volume of legislation relates to the internal affairs of specific industries and regulates only, inter sese, the rights of those engaged in them in which the general public has no interest, in a material sense, or in the common acceptation of that term. Knoxville Iron Co. v. Harbison, 183 U. S., 13; McLean v. Arkansas, 211 U. S., 539.
In the exercise of this' power and duty to legislate whole branches of common and statutory law have been abrogated and complete codes substituted, some of which have' imposed liability without fault as in the instance of the Workmen’s Compensation Laws. N. Y. Central Railroad Co. v. White, 243 U. S., 189. The constitution creates no vested right in any rule of law. The whole body of laws regulates the lives, the liberty and the property of the people in an almost infinite variety of ways. The existing laws represent changes made in laws heretofore existing. They are exertions of the powers of government. They are exertions of the police power. They are the performance of the present duty to govern living people. That duty undoubtedly will require many changes in laws now in operation.
No one questions the competency of government to regulate generally. That would be to deny all law making power. The enactment (House Bill No. 705) is valid unless its invalidity is made to appear and so the contest must be against the specific regulation on the ground that it operates unequally or has no reasonable relation to the object to be attained, or that the object is not a valid purpose of government — is not a public purpose.
For long it was contended that regulation by price-fixing *130 had limitations not applicable to other forms of regulation, but in view of the trend of decisions from Munn v. Illinois, 94 U. S. 113, to Nebbia v. New York, recently decided by the Supreme Court of the Unted States, it must be held that the constitutionality of regulation by price-fixing must stand or fall by the same tests that are applicable to other forms of regulation.
In some cases the power to regulate prices has been found in the presence of the familiar public utility feature; in others in the long continued exercise of the power over certain trades and callings, and in others, where neither privilege granted nor ancient precedent long recognized is present, on the ground that in the change of time and circumstance the particular trade or calling has become “clothed with a public interest.” German Alliance Ins. Co. v. Lewis, 233 U. S., 389; Brass v. North Dakota, 153 U. S., 391. In still other cases the governmental power has been' denied, because on the records presented it appeared that the regulation of the rate had no reasonable relation to any proper governmental purpose. Of these latter are Tyson v. Banton, 273 U. S., 418, in which the enforcement of the New York statute attempting to fix the resale price of theatre tickets was enjoined, and Ribnik v. McBride, 277 U. S., 350, in which the New Jersey law purporting to authorize an official to grant or withhold a license to carry on the employment agency business was held unconstitutional. As I construe these decisions, whatever disagreement was expressed in the opinions resulted more from opposite conclusions drawn from the facts than from any dispute as to the law. No justice contended for a rigid and immutable classification. All recognized that a trade or business not subject to regulation of its rates or price at a given time might become so as a result of changed conditions. They agreed that conditions might “clothe” a business “with a public interest.” They disagreed as to when the transition had taken place.
In Nebbia v. New York, the court speaking through Mr'. Justice Roberts said:
“Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both *131 shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate It in the common interest. As Chief Justice Marshall said speaking specifically of inspection laws, such laws form ‘a portion of that immense mass of legislation, which embraces every thing within the territory of a state. * * * All which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws regulating the internal commerce of a state, * * * are component .parts of this mass’.”
Justice Barbour said for this court:
“* * * js n0£ only the right, but the bounden and solemn duty of a state, to advance the safety, happiness and prosperity of its people, and to provide for' its general welfare, by any and every act of legislation, which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called internal police, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive.”
And Chief Justice Taney said upon the same subject:
“But what are the police powers of a state? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a state passes a quarantine law, or a law to punish offenses, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution of the United States.
“Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government. Touching the matters committed to it by the Constitution the United States possesses the power, as do *132 the states in their sovereign capacity touching all subjects jurisdiction of which is not surrendered to the federal government, as shown by the quotations above given. These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need.
“The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each'regulation depends upon the relevant facts.”
In Nebbia v. New York, supra, the statute expressly conferred the power to fix prices in accordance with conditions prescribed by the law. Mr. Justice Roberts repudiated the view that there was anything “peculiarly sacrosanct about the price one may charge” whereby the state is rendered “incapable of directly controlling the price itself.” It seems clear that he would repudiate with equal emphasis the converse that there is inherently and necessarily something peculiarly ignoble in the provisions of a contract fixing the conventional rights of the parties in terms of the legal medium of exchange, that exposes them to a degree of governmental control not exercisable over mental control of the terms .of contracting. The governmental control of the terms of private contracts is to be determined in all instances by their relation to the public welfare.
*133 It should be noted that in neither the National Industrial Recovery Act, nor House Bill No. 705, is authority to fix prices expressly conferred. If the legislation confers such power upon the administrative officers, it must result because it is a reasonable method of carrying out the purpose of the act and is in harmony with the principles therein announced.
The declared purpose df House Bill No. 705, as stated in the preamble, is cooperation by the state with the federal government in effectuating the policies of the National Industrial Recovery Act by encouraging, among other things, industrial recovery, reduction of unemployment, fostering fair competition and eliminating unfair competitive practices. In Section 1 the legislature pronounced the existence in this state of the present acute economic emergency stated in the National Industrial Recovery Act, and that such emergency related not only to interstate commerce, but also to commerce and transactions wholly intrastate. While all of the provisions of the National Industrial Recovery Act are not incorporated in House Bill No. 705, it seems clear that in determining the meaning of the terms used in that bill reference must be had to the meaning given them by said Act of Congress; so that when the Ohio Legislature declared its recognition of the economic emergency as described in the National Recovery Act, it was equivalent to a declaration by the Ohio Legislature that there existed at that time with the state of Ohio, affecting intrastate transactions, widespread unemployment and disorganization of industry detrimental to the public welfare and undermining the standards of living of the people of the state. It was in the light of such conditions that House Bill No. 705 was enacted.
It seems clear that if such conditions existed, legislation having for its object the correction or alleviation thereof would certainly be within the purpose of government, and that therefore the only debatable question would be whether or not the legislation enacted ostensibly to relieve or alleviate the hardships resulting from such condition was in fact so intended, had reasonable reference to it, and afforded equal protection. We will assume, therefore, that the declared purpose was a public purpose and that there *134 was basis in fact for such declaration, and shall proceed immediately to consider the terms of the law in order to reach a conclusion as to their meaning and the extent to which the regulations have reasonable reference to such purpose and afford equal protection.
The Act assumed to confer power upon the Governor to regulate intrastate commerce, trades and industries through the method of codes prepared by representatives of the different trades or industries, which codes, by Section 3-b, were required to conform to certain standards and to be approved by the Governor. Section 3-b makes these provisions as to the contents of such codes:
“In case any code or codes of fair competition agreed upon pursuant to paragraph (a) of this section shall affect intrastate commerce in this state only, and not be subject to the approval of the president by virtue of section 3 (a) of Title I of the National Industrial Recovery Act, then and in such case, upon the application of the governor or one or more trade or industrial associations or groups, the governor may approve any such code or codes of fair competition in intrastate commerce in this state for the trade or industry or subdivision thereof, represented by the applicant or applicants, if the governor finds (1) that such associations or groups impose no inequitable restrictions on admission to membership therein, and are truly representative of such trades or industries or subdivisions thereof; (2) that such code or codes are consistent with any like code or codes approved or prescribed by the president pursuant to Title I of the National Industrial Recovery Act, for trades, industries or subdivisions thereof, participating in this state in other steps of the economic process involved, due regard, however, being had for local conditions and local customs; and (3) that such code or codes are not designed to promote monopolies or to eliminate or suppress small enterprises, and will not operate to discriminate against them, and will tend to effectuate the policy of this act. The governor may, as a condition of this approval of any such code, impose such conditions (including requirements for the making of reports and the keeping of accounts) for the protection of consumers, competitors, employees and others, and in furtherance of the public interest, and may provide such exceptions to and exemptions from the provisions of such code, as the governor in his discretion deems necessary to effectuate the policy of this act. If the governor shall find that any such code affects the services and welfare of persons engaged in other steps *135 of the economic process, he shall, before approving the same, afford to such persons an opportunity to be heard.
“No trade or industrial association or group shall be eligible to receive the benefit of the provisions of this paragraph until it files with the governor a statement containing such information relating to the activities of the association or group as the governor shall -by regulation prescribe. The governor is authorized to prescribe rules and regulations designed to insure that any organization availing itself of the benefits of this paragraph shall be truly representative of the trade or industry, or subdivisions thereof, represented by such organization. Any organization violating any such rule or regulation shall cease to be entitled to the benefits of this paragraph.”
The power to legislate is vested by the Ohio Constitution in the legislature and in no other governmental agency. It has the authority to make the laws. It, of course, cannot change the constitution by abdicating in favor of some one else. Its enactments must provide rules of conduct, and we are confronted in this case with the question whether or not the language just quoted provides standards or rules of conduct, or whether it is an attempt by the legislature to confer upon the governor the power to prescribe the standards or rules of conduct.
It will be observed that in the approval or promulgation of codes the general purpose of all the codes is to enforce (1) fair competition, (2) that no inequitable restrictions on admission to membership in the associations or groups concerned should be imposed; (3) that the code should be consistent with any like code approved or prescribed by the president pursuant to Title I of the National Industrial Recovery Act; (4) that the code is not designed to promote monopolies or suppress small enterprises, and not operate to discriminate against them. Substantially the same requirements are prescribed in the National Industrial Recovery Act.
Do these provisions provide a standard or rule sufficiently clear and certain as to rise to the dignity of law and leave to the governor, acting through agencies selected by him, the mere power of filling in the details in the form of administrative regulations ?
*136 In United States v. Cohen Grocery Co., 255 U. S., 81, the court declared the provisions of the Lever Act that made it an offense for any person willfully “to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries,” to be void and unenforceable, on the ground that it was too vague and indefinite and fixed no standard of guilt. The court said that to attempt to enforce the law “would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury.”
In Connally v. General Construction Co., 269 U. S., 385, the court considered a statute of Oklahoma providing that “not less than the current rate per diem wages in the locality where the work is performed” shall be paid to laborers so employed, and held that the statute was void under the due process clause for indefiniteness. In that case the court recognized that due process did not require mathematical precision, but only reasonable definiteness. The court said:
“The precise point of differentiation in some instances is not easy of statement; but it will be enough for present purposes to say generally that the decisions of the court, upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enáble those within their reach to correctly apply them. Hygrade Provision Co. v. Sherman, 266 U. S. 497, 69 L. Ed. 402, 45 S. Ct. R. 141; Omaechevarria v. Idaho, 246 U. S. 343, 62 L. Ed. 763, 38 S. Ct. R. 323, or a well settled common-law meaning, notwithstanding an element of degree in the definition as to which estimates, might differ, Nash v. United States, 229 U. S. 373, 57 L. Ed. 1232, 33 S. Ct. R. 780; International Harvester Co. v. Kentucky, supra, or, as broadly stated by Mr. Chief Justice White in United States v. Cohen Grocery Co., 255 U. S., 81, 65 L. Ed. 516, 41 S. Ct. R. 298, 14 A. L. R. 1045, ‘that, for reason found to result either, from the text of the statutes involved or the subjects with which they dealt, a standard of some sort was affected’.”
In State v. Schaeffer, 96 O. S. 215, the court at page 236 said:
*137 “Absolute or mathematical precision is not required in the framing of a statute. Reasonable certainty of the nature and cause of the offense is all that is .required.”
That was said of a statute that made it an offense to operate a motor vehicle upon a public street at a speed greater than is reasonable or proper under, the circumstances, the court in effect holding that the standard of reasonable care had a well settled common law .meaning.
The cases undoubtedly require that legislation contain some rule. In conferring legislative power the Constitution so requires. It is implicit in the term. Whether legislation purports to formulate rules of conduct for persons generally, or confers powers upon administrative officers, the requirment that the language of the statute shall contain a meaning susceptible of definition is the same.
In the case of Hampton & Co. v. United States, 276 U. S., 394, the court considered the constitutionality of the so-called flexible tariff provisions of the act of 1922, which authorized the President to change the tariff on particular articles when investigation disclosed that the duties fixed in the act did not equalize the difference in costs of production in the ’United States and the principal competing country. It was' contended that this section of the act was void as a delegation of legislative power. The court sustained the constitutionálity of the act. The court recognized that Congress could not delegate its legislative función, but also took cognizance of its power to vest discretion in administrative officers to make public regulations interpreting a statute and directing'the details of its execution. The court said:
“If Congress shall lay down by legislative act an intelligible principal to which the person or body authorized to fix such rates is directed to conform, such' legislative action is not a forbidden delegation of legislative power.”
We must therefore search the provisions of House Bill No. 705 for an intelligible principle to which the governor in making regulations by codes must conform. Is there such an intelligible principle or principles. Its object is to enforce fair competition without promoting monopolies *138 and without suppressing small enterprises or discriminating against, them. To accomplish this object groups are permitted to form associations and agree among themselves on rules of fair competition. These rules among the members would have the sanction of contractual obligations, any law against trusts or monopolies to the contrary notwithstanding. No person is bound contractually by them, however, unless and until he becomes a member of the association. The codes must permit all persons following the trade to become members on the same terms; and so long as the person is outside of the association the rules of the association must not be discriminatory, so as to subject the non-member to those discriminations from which the anti-trust laws were intended to protect him. By relaxing the anti-trust laws it .was not intended to sanction the evils they were designed to prevent.
Unfair trade and monopolies are familiar terms in the law and undoubtedly have received such general currency that most people know their meaning in a general way. But unfair trade or unfair competition in the. meaning of the law, and also in the common understanding, has in it the element of fraud or misrepresentation, or other recognized unethical conduct. 47 Harvard Law Rev., 458, at 461 and 462.
In Federal Trade Com. v. Gratz, 253 U. S., 421, at 427, the court said:
“The words ‘unfair method of competition’ are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as matter of law what they mean. They are clearly inapplicable.to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly. The act was certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade.”
See also Sears, Roebuck & Co. v. Federal Trade Commission, 258 Fed. 307.
Unfair competition does not include price cutting or any other method of acquiring trade that does not involve de *139 ception of the public, or an infringement of the rights of the competitor. Nims on Unfair Competition (3rd Ed.) Sec. 300.
The legislature must be presumed to have known of this judicial definition of unfair competition when it enacted House Bill No. 705.
The codes, which the act authorizes as binding upon all regardless of any contractual obligation, therefore, must be limited by the principle set forth in the law, that is, to regulations to eliminate unfair competition, prevent monopolies and discrimination against small enterprises. In other words, the prohibitory regulation must conform to the legal concept of unfair competition. Sears, Roebuck & Co. v. Federal Trade Commission, supra and Federal Trade Commission v. Gratz, supra.
The court is therefore of the opinion that the act so construed conforms to the due process clause and is not violative of Section 1, of Article II, of the Ohio Constitution, in that it is a delegation of legislative power.
That brings us to a consideration of the provisions of the code of regulations for dyers and cleaners, which authorize the “Code Authority” to establish “fair and reasonable minimum retail prices” in this area, under which were fixed the prices set forth in the petition. In my opinion this provision is unenforceable for three reasons— first, that House Bill No. 705 does not either expressly or impliedly .authorize the governor to regulate by the fixing of prices; secondly, that if it did confer such authority, it could be exercised only under circumstances making it an appropriate means to a proper governmental end, and as no facts are pleaded disclosing the existence of a proper relation between price regulation and some just object of government, it must be held, as applied to the facts pleaded, that it would lack due process of law ¡'thirdly, the law sets no standard — states no intelligible principle — by which to determine a fair minimum price, and for that reason it cannot be construed to authorize the administrative officers to bind dissenters by incorporating such a provision in any code of regulations, and that therefore the provisions of the “Code of Fair Competition” authorizing the “Code Authority” to prescribe prices, and the action of said “Code *140 authority” in fixing the prices, alleged in these petitions, cannot be sustained as an administrative regulation supplying the details implicit in a declared general principle or policy. Sears, Roebuck & Co. v. Federal Trade Commission, supra, p. 312.
This decision rests solely upon the invalidity of the provisions of the administrative provisions fixing the price for dyeing and cleaning, and not at all upon the unconstitutionality of either the National Industrial Recovery Act or House Bill No. 705. This distinction is manifest and important. Its significance is pointed out in an article by Professor Field, of the University of Minnesota, in the Minnesota Law Review of February, 1934. At pages 294 and 295 he says:
“Mention should be made of the confusion which is present in current discussion of the constitutionality of the Recovery Act, arising as it does out of an assumption that because a code may contain something which is unconstitutional the recovery act itself is invalid. The act is not to be judged by the codes or agreements formulated under it. Codes may be formulated which are not authorized by the statute. The statute will not be unconstitutional merely because those who administer it fail to follow it. The code provisions may in some instances be illegal, or they may be unconstitutional, but the recovery act is to be judged on its own merits, on what it authorizes to be done, and not upon what is done in its name. Many questions of statutory interpretation and administrative law doubtless will come before the courts because of the act, but these are to be distinguished from questions of the constitutionality of the act itself. Due process imposes a standard of reasonableness not only upon the act itself, but also upon the administrative actions taken in pursuance of it. Actions taken must be reasonable, and if the act does not fix any standard the due process clause does so, and the courts will apply that standard. But if the act fixes a standard which is reasonable, and the administrators fix an unreasonable standard, it is the administrative action which is invalid, not the statute.”
The cases of Yick Wo v. Hopkins, 118 U. S., 356, and People ex rel. v. Van de Carr, 199 U. S., 552, illustrate the distinctions made in the quotation.
The demurrers are sustained.